UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**FILED**

---------------------------------------------x

BEVERLY KAHN,
      Plaintiff

v.

FAIRFIELD UNIVERSITY,
      Defendant

---------------------------------------------x

Case No.
3-02-CV-1576(JCH)

May 6, 2004

2004 MAY -7  A 10: 58

U.S. DISTRICT COURT
BRIDGEPORT, CONN

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff, Beverly Kahn, through her undersigned counsel, initiated this action by filing a

complaint on September 6, 2002. Plaintiff's Complaint sets forth claims for gender

discrimination under 42 U.S.C. 2000e *et seq.* ("Title VII") and Conn. Gen. Stat. § 46a-60 *et seq.*

("CFEPA"), age discrimination under 29 U.S.C. § 621 *et seq.* ("ADEA") and CFEPA, and

intentional infliction of emotional distress. Upon the completion of discovery, Defendant

Fairfield University initiated the instant motion for summary judgment. Plaintiff hereby opposes

Defendant's motion for summary judgment.

The evidence adduced through discovery establishes each element of Plaintiff's gender

discrimination claim under both Title VII and CFEPA. Moreover, Defendant's proffered

nondiscriminatory explanation for its employment decision is easily refuted as mere pretext.

Plaintiff hereby withdraws, however, her age discrimination claims under both the ADEA and

CFEPA, as well as her claim for intentional infliction of emotional distress, due to the dearth of

evidence acquired to support those claims. Accordingly, the court should deny Defendant's

motion for summary judgment with respect to the gender discrimination claims set forth in Count

1

One and Count Two of Plaintiff's complaint, and grant the motion with respect to the age discrimination and intentional infliction of emotional distress claims set forth in the balance of the complaint.

## II.    BACKGROUND

The College of Arts and Sciences at Fairfield University is "the heart of the University." (Kahn Depo. at 130.)  Two-thirds of the faculty and students at the University are located within the College of Arts and Sciences.  (Kahn Depo. at 130; Deignan Depo. at 61.)  According to the University's own description, "[t]he College of Arts and Sciences is the oldest school at the University and is a primary focus of Fairfield University's character as a Catholic and Jesuit institution."  (Description of Dean of the College of Arts and Sciences, Defendant's Ex. 3.)

There is an historic lack of representation of females in positions of leadership at Fairfield University, particularly the College of Arts and Sciences.  Indeed, the University's student newspaper, *The Mirror*, published an article documenting the lack of female representation at the highest levels of the University's administration.  (Kelley Depo. at 68; Mirror Art., Plaintiff's Ex. 1)  Faculty members have opined that the lack of representation is the result of a policy of not promoting women and a long tradition of favoring men.  (*See, e.g.*, Kahn Depo. at 128, 141; Schwab Depo. at 12, 14-17.)  Other female faculty members have observed unfavorable treatment towards women at the University.  (*See* McEvoy Depo. at 75.)  To the extent that Defendant does appoint females to leadership positions, such as Dean of a College, it is to schools that are stereotypically and historically occupations that are viewed as "appropriate"

for women, such as Nursing,[1] Education,[2] and Continuing Education[3]. (Kahn Depo. at 129; Kelley Depo. at 71; Grossman Depo. at 144.)

Based on her distinguished academic and administrative career, Defendant Fairfield University hired Plaintiff Dr. Beverly Kahn as Assistant Dean of the College of Arts and Sciences and Associate Professor of Politics in 1990. (Kahn Aff. ¶ 5; see also Kahn Application Package, Defendant's Ex. 9.) Plaintiff was the first female administrator in the College of Arts and Sciences. (Kahn Depo. at 128.) Defendant has never appointed a female as the Dean of the College of Arts and Sciences or as its Academic Vice President. (Kahn Depo. at 128; Grossman Depo. at 141, 143-44.)

As Assistant Dean of the School of Arts and Sciences, Plaintiff had a variety of academic and administrative responsibilities, which she performed very well. Indeed, she was nominated for and received a Fulbright grant in order to participate in a international academic administration program in Tokyo, Japan. (Recommendation Letter and Grant Award Letter, Plaintiff's Ex. 2.)

One of Plaintiff's principle responsibilities as Assistant Dean was to prepare students for the Fulbright scholarship application process. (Miners Depo. at 20.) Before Plaintiff's involvement in the Fulbright process, Fairfield University's record in that regard was admittedly "[n]ot particularly good." (Kelley Depo. at 15.) According to Father Kelley, President of the University, Plaintiff "did a very fine job of preparing students" and as a result of Plaintiff's efforts, the University "became successful on a consistent basis." (Kelley Depo. at 15.) Dr. McEvoy, who worked on the Fulbright committee with Plaintiff since 1996, concurred in Father

---

[1] The Dean of the School of Nursing, Jeanne Novotny, replaced another female. (Kelley Depo. at 71.)
[2] Dr. Margaret Deignan is the Dean of the School of Education and Allied Professions. (Deignan Depo. at 10.)
[3] Dr. Edna Wilson is the Dean of University College, Fairfield University's school of continuing education. (Mirror Article, Plaintiff's Ex. 1.)

Kelley's praise for Plaintiff. (McEvoy Depo. at 18-19.) According to McEvoy, Plaintiff "was a real catalyst for getting it underway." (McEvoy Depo. at 18; McEvoy Letter to Kelley, Plaintiff's Ex. 3.)

Based on her excellent performance, she was promoted to Associate Dean in 1994 upon the recommendation of Dr. Grossman, then Dean of the College of Arts and Sciences. (Kahn Aff. ¶ 6; Kelley Depo. at 16; Grossman Depo. at 22.) In connection with her Associate Dean position, Plaintiff received her only written performance evaluation. In that evaluation, Dr. Grossman described her as "outstanding" in numerous performance areas. (Grossman Depo. at 39-40; Plaintiff's performance evaluation, Plaintiff's Ex. 4.) In particular, her excellence was recognized with respect to:

- accepting responsibility and initiating action;
- planning and organizing work;
- setting meaningful goals and reaching them on time;
- oral and written communication;
- staff and peer interaction;
- adjusting to new requirements and work conditions;
- sound decision making in diverse and stressful situations; and, *inter alia*,
- involvement in University service.

Also during her tenure as Associate Dean, Father Kelley congratulated Plaintiff on her good work after the University's students dedicated the Year Book to her. (Kelley Letter to Plaintiff, Plaintiff's Ex. 5.)

Despite her performance and accomplishments, Plaintiff was paid substantially less than male counterparts that were appointed from the faculty to the other Associate Dean's position on a rotating basis. Plaintiff's salary as an Associate Dean in the College of Arts and Sciences was always 10,000 dollars less than her male counterparts – even though she had held such positions for years and she was performing the same job. (Kahn Depo. at 157; Grossman Depo. at 33-35.) Plaintiff challenged the University with respect to the disparity in salaries between her and her

peers. (Kahn Depo. at 158; Pay Grievance Correspondence, Plaintiff's Ex. 6)  Her request for increased compensation was denied by the then Academic Vice President, Dr. Wall.  (Kahn Depo. at 163.)

After Dr. Wall passed away, Defendant conducted a search for a new Academic Vice President. Ultimately, Dr. Grossman was selected and promoted to the position of Academic Vice President. Under those circumstances, Plaintiff was appointed the Acting Dean of the College in 1999. (Kahn Aff. ¶ 7; Appointment letter, Defendant's Ex. 18.)

Consistent with past practice, Plaintiff received a salary as Acting Dean of the College of Arts and Sciences substantially less than that paid to Dr. Grossman when he was Dean.  (Kahn Depo. at 158, 175-76.)  Indeed, Dr. Grossman believed that Plaintiff deserved a higher salary. (Grossman Depo. at 53, 59-62.)  Although she never received a salary equivalent to her male predecessor, Plaintiff was reappointed to the Acting Dean position in 2000. (Kahn Aff. ¶ 7; Reappointment letter, Defendant's Ex. 18)

As the Acting Dean of the School of Arts and Sciences, Plaintiff performed all the responsibilities that would be expected of the Dean of the College.  (Kelley Depo. at 26; Grossman Depo. at 93-94.)  As part of her responsibilities as Acting Dean, Plaintiff participated in meetings with the council of academic deans.  Plaintiff's relationship with the other deans on the council was collegial and her input to Dr. Grossman was appropriate.  (Deignan Depo. at 14-15.)  Other members of the council of academic deans observed that Plaintiff was doing an effective job in her role as Acting Dean of the School of Arts and Sciences.  (*See, e.g.*, Deignan Depo. at 16.)  Further, Plaintiff worked well with the Deans in the other schools at the University and made positive improvements in academic programs.  (*See, e.g.*, Deignan Depo. at 17-18; Miners Depo. at 19-25.)  For instance, Plaintiff and Dr. Margaret Deignan, Dean of the Graduate

School of Education and Allied Professions, worked together to restructure and improve the
undergraduate teacher certification program. (Deignan Depo. at 17.)

Plaintiff also worked well with department chairs in the School of Arts and Sciences. For
example, Dr. Schwab, former Chair of the Department of Visual and Performing Arts, explained
how Plaintiff, when Acting Dean, freed up more money for her department than had been
available under Dr. Grossman, who was formerly the Chair of the Department of Visual and
Performing Arts and the Dean of the College of Arts and Sciences. (Schwab Depo. at 30-31.)
Another professor, Dr. Lawrence Miners, who worked with Plaintiff on a "daily" basis in the
Dean's office, testified that he had a good relationship with Plaintiff when he worked with her in
the Dean's office. (Miners Depo. at 19-25.) He also observed no problems between Plaintiff and
any faculty members. (Id.) In his observation, Dr. Miners believed that Plaintiff performed her
duties as Acting Dean effectively. (Miners Depo. at 33, 60.)

In the Fall of 2000, Defendant initiated a formal search to hire a permanent Dean of the
College of Arts and Sciences. (Grossman Declaration , Defendant' Ex. A at 2.) In accordance
with University policies and procedures, Father Kelley created a search committee to pick the
next Dean of the School of Arts and Sciences. (Kelley Depo. at 28; McEvoy Depo. at 10; Search
policies, Defendant's Ex. 1.) Dr. Grossman, the Academic Vice President who appointed
Plaintiff to the position of Acting Dean, was duly appointed the chair of the committee. (Kelley
Depo. at 28.)

While the formation of the search committee conformed to University policies and
procedures, other policies and procedures critical to this matter were completely disregarded. In
particular, the University's Equal Employment Opportunity and Affirmative Action policies and
procedures were largely disregarded. (Affirmative Action Policies, Plaintiff's Ex. 7.) For

6

instance, the members of the search committee were never briefed about the University's Affirmative Action policy. (*See, e.g.*, McEvoy Depo. at 13-14; Deignan Depo. at 20-23.) Moreover, the Affirmative Action Compliance Report required by University policies and procedures was not completed in a timely or accurate fashion. (See Guidelines, Defendant's Ex. 2, p. 3, and Affirmative Action Compliance Report, Defendant's Ex. 17.)

Apparently the University's employment policies were not the only thing disregarded. Upon commencement of their task, Father Kelley gave a charge to the search committee in which he reminded them that "since it is a committee composed primarily of faculty members that it is a search for an academic administrator and that they should bear that in mind, that while such things as publications and research and so forth are important, what is really looked for is administrative skills . . . ." (Kelley Depo. at 28-29.) This direction also appears to have been lost on the search committee.

As an initial matter, the search committee created an advertisement and ran it in the Chronicle of Higher Education. (McEvoy Depo. at 14; Classified Ad, Defendant's Ex. 4.) Plaintiff was nominated for the position and submitted an application along with many other applicants from across the country. (Grossman Declaration, Defendant's Ex. A at 2; Plaintiff's Application Package, Defendant's Ex. 9.) After reading Plaintiff's cover letter, committee member Dr. McEvoy was impressed that Plaintiff had a "strong sense of where Fairfield should go in the future." (McEvoy Depo. at 26.) Plaintiff met all of the objective criteria for the position. (See Position Descriptions, Plaintiff's Ex. 8, and Classified Ad, Defendant's Ex. 4).

From the group of applicants, the search committee selected a group of ten or twelve candidates to be interviewed on a weekend in January 2001. (Miners Depo. at 63; Candidate interview list, Defendant's Ex. 5.) Several committee members viewed Plaintiff's qualifications

favorably. (Committee Notes, Plaintiff's Ex. 9.) Accordingly, Plaintiff was selected for an

interview by the committee. (Interview List, Defendant's Ex. 5.)

Plaintiff was the last candidate interviewed on Saturday, January 27. (Miners Depo. at

63; Interview Schedule, Defendant's Ex. 7.) According to members of the committee, Plaintiff

had a good interview. (*See, e.g.*, Deignan Depo. at 41; McEvoy Depo. at 38-39.) Dr. McEvoy

described Plaintiff's performance in the following way when asked about the discussion that

took place following Plaintiff's interview:

> I think the consensus was that she had given a boffo interview. Beverly Kahn
> was Beverly Kahn. She was on top of her game, she was knowledgeable, she was
> as you would expect being the acting Dean. She was highly energetic and knew
> everything about everything. And, you know, it was impressive except for people
> who weren't going to be impressed.

(McEvoy Depo. at 40.) McEvoy recalls that she thought Plaintiff interviewed well immediately

following her interview on Saturday afternoon and that several committee members were in

support of Plaintiff's candidacy at that time. (McEvoy Depo. at 47-48.)

After the conclusion of the other interviews on the next day, each committee member

voted for who he or she believed to be the top three candidates. Dr. Grossman calculated the

votes. (Miners Depo. at 64.) Although the committee was directed to recommend the top three

candidates for consideration by the University's President, Father Kelley, the vote was close

enough that the committee felt the need to recommend four instead. (Miners Depo. at 67-68.)

Plaintiff was not among the top four candidates as of that initial vote on Sunday. (Miners Depo.

at 68-69.) All four candidates forwarded for consideration by Father Kelley were male.

After the committee decided not to include Plaintiff as a finalist for the position, Dr.

McEvoy explained to the committee that failing to include her as a finalist would be a *prima*

*facie* act of discrimination. (Kahn Depo. at 106; Deignan Depo. at 66-70; McEvoy notes,

8

Defendant's Ex. 22.)  McEvoy explained, through the use of an illustrative chart comparing the

credentials and qualifications of Plaintiff to each of the four men who had been preliminarily

selected as finalists on the previous Sunday, that Plaintiff's qualifications were equal, if not

superior, to the qualifications of the other four men.  (McEvoy Depo. at 57-61; Comparison

Chart, Defendant's Ex. 21.)  She listed the schools where they worked, their current positions,

academic rank, how long they held their respective jobs, how long they held employment as a

dean, total years of experience, their field of study, other schools they had worked at, service as a

department chair, extent of Fulbright experience, publications, descriptions of educational vision,

Jesuit experience, diversity, respective positions on merit pay, and grant history.  (Id.)  McEvoy

explained that Plaintiff was a fully qualified candidate who had worked her way up the ladder of

assistant, associate, and then acting Dean at the University without any criticism about her

performance in any of those roles or any evidence that she was not doing her job properly.  As a

result, Dr. McEvoy advised that Plaintiff would be able to make out a *prima facie* case of

discrimination under Title VII.  (McEvoy Depo. at 65.)

Apparently, Dr. Grossman was also concerned that the committee's conduct was

potentially actionable under Title VII.  When Dr. McEvoy finished speaking to the committee,

Dr. Grossman told her that he had "consulted with the University's attorney, and Beverly Kahn

can make out a *prima facie* case for discrimination." (McEvoy Depo. at 65-66.)  Nevertheless, he

allowed the committee's decision to stand.  (Id.)  When Dr. McEvoy asked the committee, "what

do they think our chances are of getting away with this," she received no response.  (McEvoy

Depo. at 66.)  During the course of the meeting, Dr. McEvoy asked Dr. Grossman how he would

feel if his daughter were treated the same way as the committee was treating Plaintiff.  Grossman

admitted, "I wouldn't like it."  (McEvoy Depo. at 64.)  After it became evident that the

committee did not intend to heed her warning, Dr. McEvoy resigned from the search committee in protest. (McEvoy Depo. at 76; Resignation letter, Defendant's Ex. 23.)   Thereafter, Dr. McEvoy notified Father Kelley of her resignation form the committee and the reasons therefore. (McEvoy letter to Kelley, Defendant's Ex. 24).

Even though Dr. McEvoy, a lawyer, explained to the committee that it was apparently discriminatory to not consider Plaintiff as a finalist, Defendant did not conduct an investigation or contact the University's affirmative action officer or the legal counsel to ensure compliance with anti-discrimination laws. (Kahn Depo. at 106-107; McEvoy Depo. at 88-89.)  The only action taken was by Dr. Grossman who asked the committee members at the time, in an informal manner, whether their decisions were motivated by Plaintiff's gender.  (Deignan Depo. at 68-69.) Naturally, they denied any such impropriety. (See Declaration of Dr. Grossman, Defendant's Ex. A at 3.) In addition, Father Kelly took no action, whatsoever, even after Dr. McEvoy alerted him to the possibility that the committee had discriminated against Plaintiff.  (Kelley Depo. at 37-38, 53-58; Kahn Depo. at 154; McEvoy Depo. at 88-89.)  Father Kelley did not even speak to Dr. McEvoy about the issues she had raised.  (Kelley Depo. at 38, 57; McEvoy Depo. at 88-89.)  The Human Resources department also failed to talk to any of the committee members about Dr. McEvoy's concerns.  (Deignan Depo. at 73; McEvoy Depo. at 88-89.)  Defendant also failed to follow up on concerns raised by other faculty members in connection with Plaintiff's exclusion from the final round of candidates. (Fedorchek and Sourieau Letters, Plaintiff's Ex. 10.)

On January 31, 2001, Dr. Grossman informed Plaintiff that she was not selected as a finalist for the Dean position. (Kahn Depo. at 23, 27-28.)  Plaintiff inquired with Dr. Grossman during subsequent conversations about the reasons why she was not selected as a finalist.  Dr. Grossman failed to respond to several of Plaintiff's questions about why she was not selected.

(Kahn Depo. at 125-26.) His only response was "mumbl[ing] something about the Pew grant." (Kahn Depo. at 124.) At that time, Plaintiff was not aware of any facts that led her to believe that Defendant's decision was discriminatory. (Kahn Depo. at 44.)

After the search committee made its final recommendations, Dr. Grossman completed the University's Affirmative Action Report. (Affirmative Action Report, Defendant's Ex. 17) In that connection, he falsely indicated that there were no qualified minority candidates for the position. (Id.) As a result, he did not respond to any of the questions regarding the rationale for not hiring the qualified minority candidate, Plaintiff. (Id.)

Consistent with past practice, the University's new Dean of the College of Arts and Sciences, Dr. Timothy Snyder, was paid 130,000 dollars per year, approximately 45,000 dollars more than Defendant paid Plaintiff during the preceding two year period when she served as Acting Dean. (Kelley Depo. at 50-51, 61; compare Kahn Acting Dean Appointment Letter and Snyder Offer Letter, Defendant's Exs. 16 and 18.) Father Kelley admitted that he gave no thought to the substantial pay inequity between Plaintiff and Dr. Snyder, and could not articulate any functional difference between Plaintiff's two year "temporary" appointment as Acting Dean and Dr. Snyder's "permanent" appointment as Dean. (Kelley Depo. at 50-51.)

By March, 2001, when Plaintiff learned the identity and gender of the four finalists, she suspected that her gender might have played a role in the Defendant's decision. (Kahn Depo. at 46.) Plaintiff did not learn until mid-April, however, that Defendant had made a final decision and chosen to hire another applicant for the position. (Kahn Depo. at 23-24.) And it was not until May 23, 2001, that Plaintiff's suspicion that discrimination played a role in the selection process was confirmed. (Kahn Depo. at 28.) On that date, Plaintiff met with Dr. McEvoy who

explained that she believed Defendant's selection process and decision to hire a male instead of Plaintiff violated anti-discrimination laws. (Kahn Depo. at 28, 46, 59)

Under those circumstances, Plaintiff applied for and accepted a job as the Assistant Provost for Academic Affairs at Pace University on August 20, 2001. (Kahn Depo. at 7, 15-16.) Thereafter, Plaintiff retained counsel and filed a discrimination charge with the CHRO on November 15, 2001, and further requested that the charge be filed with the EEOC. (Plaintiff's CHRO filing, Defendant's Ex. 26.) After waiting the mandatory waiting period, Plaintiff sought permission to sue and filed her complaint with this court on September 6, 2002.

During the course of discovery, Defendant presented a variety of explanations as to why Plaintiff was by passed in favor of four male candidates. In light of Plaintiff's record of admitted accomplishments, including but not limited to: receipt of a Fulbright grant, the admitted turnaround of the University's floundering Fulbright application program, her promotion from Assistant to Associate Dean, Dr. Grossman's "outstanding" review, her appointment as Acting Dean, her successes as Acting Dean and, *inter alia*, her reappointment as Acting Dean, Defendant's after the fact explanations reveal themselves to be self evident pretext.

Thus, in direct contradiction to Dr. Grossman's evaluation and Dr. Deignan's and Dr. Miners' testimony, Father Kelley testified that he had heard "that [Plaintiff] was difficult to work with." (Kelley Depo. at 26.) More incredibly, Dr. Schwab contradicted her own testimony about Plaintiff's unprecedented effort to free up money for the Art Department and said that she found it very frustrating to work with Plaintiff. (Schwab Depo. at 26-27.) Dr. Schwab also provided inconsistent testimony when she indicated that the University needed a Dean "to take us to the next level," but complained that Plaintiff "made prospective Fulbright Scholars work hard on their applications, and . . . put pressure on them" and that Plaintiff was "unreasonably demanding

of faculty." (Kahn Depo. at 101; McEvoy Depo. at 49; Schwab Declaration, Defendant's Ex. D at 2.)  In direct contradiction to Father Kelley's admissions about the Fulbright program, Dr. Deignan's experience restructuring the undergraduate teaching certification program, and Dr. Miners experience working with Plaintiff on a daily basis in the Dean's office, Schwab also contended that Plaintiff failed to demonstrate "leadership and vision" because she had a "problem of building consensus." (Schwab Depo. at 45, 48, 50-51.)

Although Dr. Deignan thought Plaintiff had a good interview and they had worked well together in the past, she explained that she voted against selecting Plaintiff as a finalist because her interview was not as good as the others. (Deignan Depo. at 53.)  When asked to specify what was deficient about Plaintiff's interview performance, Dr. Deignan could only articulate that Plaintiff failed to express her vision for the School of Arts and Sciences despite the fact that it was set forth in black and white in her application package. (Deignan Depo. at 53-54; Kahn Application Package, Defendant's Ex. 9.)  Dr. Deignan could only recall that Plaintiff's vision for the School of Arts and Sciences perhaps lacked "flexibility." (Deignan Depo. at 55.)

Dr. Deignan also stated that the committee members who opposed Plaintiff did so because she was "arrogant." (Deignan Depo. at 55, 58.)  When asked to elaborate on Plaintiff's alleged arrogance, Dr. Deignan stated that "she would follow through on her own agenda regardless of whether or not she had departmental or faculty support."[4] (Deignan Depo. at 55.)  Deignan recalled that other committee members described Plaintiff as somebody who would "forge ahead and do what it was that she wanted to do regardless of how the faculty and the department felt about it." (Deignan Depo. at 60.)  Dr. Deignan admitted, however, that based on her previous interactions with Plaintiff, that Plaintiff was an effective leader who had always

---

[4] Dr. Deignan conceded that such a conclusion was based on information that was neither contained in Plaintiff's resume nor divulged during the course of her interview, (Deignan Depo. at 55-56), the criteria upon which all other candidates were judged.

exhibited a collegial working relationship with co-workers. (Deignan Depo. at 58-60.)

Furthermore, to the degree that Plaintiff did in fact have any conflicts with the faculty, Dr.

Deignan conceded that it was reasonable to expect that the "boss" of the biggest school on

campus would occasionally do things employees didn't like or didn't agree with. (Deignan Depo.

at 61).

For his part, Dr. Grossman explained that some "staff people felt that she was

overbearing, that she kept them late, . . . associate deans occasionally complained that she would

take projects over or give excessive advice unnecessarily or in some way interfere in their work."

(Grossman Depo. at 40.)  Dr. Grossman also recalled a couple of faculty members who

complained to him that Plaintiff was condescending or bullying.  (Grossman Depo. at 77-79.)

When confronted with his prior outstanding evaluation of Plaintiff, including communication,

sensitivity to staff interaction, and cooperation and working compatibly with peers and superiors,

Dr. Grossman attempted to undermine the significance of his prior inconsistent statements

regarding Plaintiff by characterizing them as something akin to "grade inflation." (Grossman

Depo. at 39-43; Performance Evaluation, attached hereto as Ex. 4.) When asked to summarize

the deficiencies in Plaintiff's candidacy, Grossman testified that:

> some people that felt that she had not had a good interview, that she used the "I"
> word way too much, that she promoted her own accomplishments, some felt that
> she exaggerated her accomplishments, others felt she did not provide a vision for
> the school but simply a laundry list of successes from her point of view.  Others
> felt that given her track record at the institution, she had not demonstrated an
> ability to lead the college.  Too many faculty members that did not want to work
> with her and that was really fatal to a successful candidacy here.

(Grossman Depo. at 231-32.)

Dr. Grossman, explained that the male candidate selected, Dr. Snyder, was superior to

Plaintiff with respect to his previous accomplishments and the vision of leadership he articulated

14

during his interview. (Grossman Depo. at 158-159.) Dr. Grossman had to admit, however, that many faculty members did work with Plaintiff because she has "great ideas," thus calling into question Plaintiff's supposed lack of vision. (Grossman Depo. at 113.)

Likewise, Dr. Grossman's own words contradict any suggestion that Plaintiff's academic acumen suffered in comparison to the all male finalists. In support of Plaintiff's Fulbright grant application, Dr. Grossman described Plaintiff as having "enormous knowledge concerning the academic components of internationalizing the campus." He also noted that, "She has also been a key person in a wide variety of activities, both academic and otherwise . . . ." (Fulbright Recommendation Letter, Plaintiff's Ex. 4.)

Thus, Defendant has presented an inconsistent and unconvincing explanation for its decision to deny Plaintiff the position of Dean of the College of Arts and Sciences while selecting four males as finalists and offering the Dean of Arts and Sciences position to two male candidates. Indeed, much of the language proffered by Defendant's witnesses – i.e. arrogant, insensitive, steamrolling, overbearing, inflexible, unreasonably demanding, etc. – smack of insidious gender stereotyping animus. For these reasons, as well as those set forth in the following legal analysis, Defendant's motion for summary judgment should be denied with respect to Plaintiff's claim of gender discrimination.

## III.    STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith" when the pleadings, depositions, answers to interrogatories, filed admissions and affidavits together demonstrate "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact; in that connection, all inferences

and ambiguities are to be resolved in favor of the nonmoving party. *See, e.g., Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999).

In considering the motion, the district court must diligently review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. See *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996); *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir.1994), *cert. denied,* 513 U.S. 1147 (1995). In ruling on a motion for summary judgment, the court asks not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The ultimate question is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.

In the context of employment cases, the appropriateness of summary judgment is "a particularly delicate subject." *Feliciano v. Alpha Sector, Inc.*, 2002 WL 1492139, at *5 (S.D.N.Y. July 12, 2002). The Second Circuit has recognized that a "smoking gun" rarely exists in employment actions, and that the challenged conduct "is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). A victim, therefore, is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." *Id.* at 533; *Borrero v. Collins Bldg. Services, Inc.*, 2002 WL 31415511, *7 (S.D.N.Y.2002).

Consequently, courts must be especially cautious in granting the drastic provisional remedy of summary judgment in a case such as this, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference sustaining the plaintiff's claim. *Belfi,* 191 F.3d at 135. Indeed, summary judgment is "ordinarily inappropriate" in discrimination cases where "intent and state of mind are in dispute." *Carlton v. Mystic Transportation, Inc.,* 202 F.3d 129, 134 (2d Cir. 2000) (citations omitted). "[A] trial court should exercise caution when granting summary judgment to an employer where, as here, its intent is a genuine factual issue." *Id.*

## IV.    ARGUMENT

### A.    Plaintiff Has Established Her *Prima Facie* Gender Discrimination Claim

"A plaintiff alleging a violation of [Title VII] must establish, by a preponderance of the evidence, a *prima facie* case consisting of four elements: (1) that plaintiff falls within the protected group, (2) that plaintiff applied for a position for which he was qualified, (3) that plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination." *Byrnie v. Town of Cromwell,* 243 F.3d 93, 101 (2d Cir. 2001).

Defendant does not vigorously dispute that Plaintiff has satisfied each element of her *prima facie* case of gender discrimination. (*See* Def's Mem. Supp. Summ. J. at 14.) As a female, Plaintiff is a member of a protected class. Contrary to any suggestion by the Defendant, she was qualified for the position when she applied for the Deanship at the University. Plaintiff met all of the position prerequisites and was selected for an interview based on possessing all the qualifications for the job. Indeed, she performed the duties of the job well enough to be

reappointed for a second year as Acting Dean. Plaintiff clearly suffered an adverse employment action when she was denied the Deanship. Finally, by denying Plaintiff the Deanship on the basis of gender stereotypes and selecting only males as finalists for the position, Defendant subjected Plaintiff to the adverse employment action under circumstances that give rise to an inference of discrimination. Indeed, Defendant admits as much: "Dr. Kahn may rely upon the fact that the four finalists recommended by the Search Committee were male to raise an issue of fact as to circumstances which could give rise to an inference of discrimination." (*See* Def's Mem. Supp. Summ. J. at 14).

### B.   Defendant's Proffered Legitimate Nondiscriminatory Reason for Not Offering the Position to Plaintiff is Pretextual

In response to Plaintiff's *prima facie* case of gender discrimination, Defendant proffers what it purports to be a legitimate non-discriminatory explanation for that decision – ie. Plaintiff was less academically qualified than the other candidates and she did not display the requisite skills and vision to lead the College of Arts and Sciences. Defendant's explanation proves unconvincing.

"[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal citations and quotations omitted). "To rebut defendant's legitimate nondiscriminatory reason, 'plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and the prohibited factor was

at least one of the 'motivating' factors." *Pascal v. Storage Technology Corp.*, 152 F. Supp. 2d
191, 201 (D. Conn. 2001) (citing *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

In connection with this analysis, Courts have held that evidence of a strong *prima facie*
case, by itself, may be sufficient to survive summary judgment. *See, e.g., Satterfield v. United
Postal Service, Inc.*, 2003 WL 22251314 at *9 (S.D.N.Y. Sep. 30, 2003) (citing *Holtz v.
Rockefeller & Co.*, 258 F.3d 62, 81-82 (2d Cir. 2001) ("If plaintiff's *prima facie* case is strong, it
may be sufficient to raise a question of fact about the true motivation for the complained-of
employment action, in which case plaintiff would not be required to proffer further proof to
survive summary judgment."); *Ellenbogen v. Projection Video Services, Inc.*, 2001 WL 736774
at *5 (S.D.N.Y. 2001)("Therefore, in a case where plaintiff's *prima facie case* is particularly
strong, *Reeves* teaches that summary judgment *may* be inappropriate even if a plaintiff does not
introduce evidence to rebut the employer's proffered non-discriminatory justification."); 
*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 39-40 (2d Cir. 1994) (denying employer's
motion for summary judgment where plaintiff alleged a strong prima facie case and defendant's
asserted reasons for the termination raised issues of fact); *Aka v. Washington Hosp. Center*, 156
F.3d 1284, 1289 n.4 (D.C. Cir. 1998) (citing *Texas Dept Community Affairs v. Burdine*, 450 U.S.
248, 255 n.10 (1981) ("This suggests that a *prima facie* case that strongly suggests intentional
discrimination may be enough by itself to survive summary judgment."); *Ferguson v. Small*, 225
F. Supp. 2d 31 (D.D.C. 2002) ("Indeed, in some cases, a plaintiff's strong prima facie case may
so strongly suggest the existence of intentional discrimination so as to permit plaintiff to survive
summary judgment."); *Carson v. Bethlehem Steel Corp.*, 882 F. Supp. 765, 769 (N.D. Ind. 1995)
("A strong prima facie case may well be sufficient to raise a triable issue *vis-a- vis* an ostensible

legitimate non-discriminatory reason for an employment action. This is even more so where the prima facie case is combined with a viable theory of cross-examination.").

The Second Circuit's decision in *Byrnie v. Town of Cromwell Bd. of Ed.*, is particularly instructive on this issue for the instant action. 243 F.3d 93 (2001). In *Byrnie*, The plaintiff alleged that defendant violated Title VII by denying him a teaching position in a high school on the basis of his male gender. Like the Defendant in the instant action, the defendant in *Byrnie* contended that the plaintiff was not chosen because the female applicant performed better, according to subjective criteria, during the interview process. *Id.* at 102.

The Second Circuit reversed the district court's decision entering summary judgment for the defendant on the plaintiff teacher's Title VII claim based solely on the strength of the plaintiff's prima facie case and circumstantial evidence of pretext. The Second Circuit held that "[a] combination of factors, any of which judged on their own would be much less compelling, provide sufficient evidence to allow a reasonable jury to conclude that [the defendant's] explanation for failing to hire [the plaintiff] was a pretext for impermissible discrimination." *Id.* at 102.

The first of those factors was the difference between the credentials of the plaintiff and the applicant chosen. The plaintiff had a bachelor's degree and a master's degree in art education and had taught art at the high school level previously for over twenty-one years. *Id.* at 102-103. The person who was offered the position instead of the plaintiff was a less experienced and less qualified female. *Id.* She lacked a master's degree and had no previous experience teaching in a high school. *Id.* In addition, the Court found it suspect that when the applications were first reviewed only on the basis of paper submissions, the female applicant chosen was rated as being more qualified than the plaintiff despite the fact that the defendant had to relax the

job requirements in order to hire her, she lacked a master's degree, and her application was not complete. *Id.* at 103-104.

The second factor articulated by the *Byrnie* court was the defendant's reliance on subjective criteria during the interview process. The defendant's principal criticism regarding the plaintiff's interview performance was that he did not demonstrate sufficient familiarity with the basic competencies necessary for effective teaching. The court concluded that the defendant's contention was not credible because the plaintiff already had over twenty years of teaching experience at the high school level and one of the defendant's own teachers wrote a letter praising the plaintiff's work as a long term substitute teacher. *Id.* at 105. *See also Canty v. Electric Boat Corp.*, 151 F. Supp. 2d 159 (D. Conn. 2001); *Pascal v. Storage Technology Corp.*, 152 F. Supp. 2d 191 (D. Conn. 2001).

In the instant action, Defendant's asserted justifications for not selecting Plaintiff are manifestly pretextual. Defendant asserts that Plaintiff was not selected because "[s]everal members . . . were seeking a role model for academic scholarship." (Def's Mem. Supp. Summ. J. at 15.) As an initial matter, Plaintiff's qualifications more than satisfy the University's written specifications and her academic excellence was extolled by Dr. Grossman when he recommended her for a Fulbright grant. Moreover, Defendant's assertion is directly contradicted by President Kelley himself who, when charging the committee admittedly instructed them to look for a candidate with impressive *administrative* experience as opposed to a candidate who had a more extensive list of publications. (*See* Kelley Depo. at 28-29.) So, Defendant's explanation that "Dr. Kahn had spent most of her career in administration [so] [h]er scholarly accomplishments, including research, writing, and teaching . . . were less impressive than the

other candidates," (Def's Mem. Supp. Summ. J. at 15-16), is directly contradicted by President Kelley's own instruction to the committee.

Likewise, Defendant's other criticisms of Plaintiff's credentials are also contradicted by the record evidence. Defendant asserts that "the Committee members did not believe that Dr. Kahn had demonstrated effective leadership ability or a vision of the College." (Def's Mem. Supp. Summ. J. at 16; Schwab Depo. at 48-51.) Contrary to Defendant's assertion, the vision statement Plaintiff included in her application package was praised by members of the committee. According to Dr. McEvoy, Plaintiff's application indicated that she had a "strong sense of where Fairfield should go in the future." Furthermore, Defendant's own assertion that Plaintiff was not selected because she failed to demonstrate leadership and vision is further contradicted by the fact that the candidates who were selected as finalists and offered the Deanship neglected to even submit a vision statement with their application as Defendant's advertisement requested.[5]

Moreover, Plaintiff's previous experience at the University rebuts Defendant's contention that Plaintiff was not qualified for the position and that she lacked the vision and leadership necessary for the job. In *Byrnie*, the Second Circuit rejected the defendant's contention that the plaintiff was not qualified for the teaching position because he was not sufficiently familiar with effective teaching methods because the plaintiff had taught at the high school level for over twenty years and was praised for his work by other teachers. *See Byrnie*, 243 F.3d at 105.

In the instant action, Defendant's contention that Plaintiff was not qualified for the position, and lacked sufficient leadership skills and vision is rebutted by her previous experience

---

[5] When Dr. McEvoy attempted to bring this fact to the attention of the committee members, the committee members did not want to discuss it. In fact, Dr. Haegel said she did not care what was on the chart comparing the objective credentials and qualifications of Plaintiff and the selected finalists that was prepared and distributed by Dr. McEvoy. (McEvoy Depo. at 60.)

as an Assistant, Associate, and Acting Dean at the University. Specifically, Defendant's charge is contradicted by its admission that Plaintiff achieved her greatest accomplishments in her capacity as chair of the Fulbright committee, where she arguably had the greatest ability to demonstrate leadership and control over the direction of the work being performed. Further, Dr. Grossman admitted that several faculty members continued to work with Plaintiff, despite any alleged difficulties, because she was a consistent source of "good ideas."

It is inconceivable how Plaintiff could have lacked academic leadership skills when she served successfully in the Defendant's Dean's office for eleven years. It is inconceivable how Defendant can now assert that Plaintiff lacked leadership and vision when she was consistently praised by her supervisors and promoted from Assistant Dean to Associate Dean and then from Associate Dean to Acting Dean. If Defendant's contention is accurate, then why was her lack of leadership and vision never criticized by Defendant before Defendant rejected her application for the Deanship? If Plaintiff lacked leadership and vision, then why did Dr. Grossman evaluate her performance as outstanding and continuously recommend that Plaintiff be promoted and paid more money? If Plaintiff lacked leadership and vision, then why did Dr. Grossman, after working with Plaintiff for years, recommend that she be named Acting Dean? Furthermore, if Plaintiff's leadership and vision as Acting Dean were deficient, then why did Dr. Grossman allow her to remain as Acting Dean for a second year before the search committee was even formed? Those unanswered questions echo the concerns raised by the court in *Byrnie* and underscore the extent to which Defendant's criticisms of Plaintiff are pretextual and preclude summary judgment in this case.

C.    **Defendant's Reliance on Subjective Criteria and Unarticulated Standards in the Decision Making Process Instructs Against Summary Judgment**

Defendant's entirely subjective justification for not selecting Plaintiff must also be addressed. Indeed, the consistent reference to subjective criteria militates against granting summary judgment.

"[A]n employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion. This is because any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case. Accordingly, an employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext." *Byrnie*, 243 F.3d at 104-105 (internal citations and quotations omitted). Although it has admitted to reliance on subjective criteria, (*See* Def's Mem. Supp. Summ. J. at 17-18), Defendant has failed to explain its reasoning in a sufficiently consistent, clear and specific manner to pass muster on a summary judgment motion.

In connection with Defendant's burden of proving the lack of any disputed issues of material fact, Defendant cannot simply rely on vague and overly broad character traits such as leadership and vision without explaining what indices of leadership and vision were employed to measure candidates, especially when such assessments of the male candidates were made on the basis of written submissions and a single, one hour interview. Such a practice is especially untenable in situations such as the instant action where the applicant who allegedly lacked leadership and vision worked successfully as a Dean for over a decade and received nothing but praise and accolades from her supervisors. Thus, Defendant's *ex post facto* subjective explanations should not be permitted to carry the day on a summary judgment motion.

### D.    Employment Decisions Based on Gender Stereotyping Violate Title VII

Defendant's contention that the difference of opinion among members of the committee regarding Plaintiff's suitability for the Dean's position was based upon "major differences of opinion . . . regarding Dr. Kahn's leadership abilities and scholarly accomplishments," is completely disingenuous. Any attempt by Defendant to "spin" the committee's decision, and the internal conflict within the committee, into an honest debate and disagreement about Plaintiff's credentials and qualifications is absolutely beyond belief.

To the extent there was any uniform reason not to select Plaintiff, the evidence suggests that Defendant rejected Plaintiff's application because some members of the faculty did not like her and they lobbied against her candidacy. It was a decision based on personality, not an objective disagreement about Plaintiff's qualifications.

Defendant claims that Plaintiff was not selected as a finalist because some members of the faculty, thought Plaintiff was arrogant, inflexible, demanding, and/or overbearing she would forge ahead on her own agenda regardless of what some members of the faculty thought, and she interfered in the departments within the School of Arts and Sciences. Those criticisms are not consistent with somebody who has a lack of vision or leadership skills. To the contrary, forging ahead with your own agenda is the epitome of leadership, not a lack thereof. Indeed, Dr. Deignan admitted that it is reasonable to expect that the faculty would not agree with everything that Plaintiff had done. (Deignan Depo at 61.)

Defendant's purported criticisms are consistent with a strong, independent woman who is resented at times by members of the faculty who disagree with the leadership decisions that are being made. Indeed, there is ample evidence that Plaintiff's academic vision was crystal clear and her leadership style was very effective. She experienced a litany of successes, including

receipt of a Fulbright grant, single-handedly transforming the University's Fulbright scholarship program into a consistent success, and running the School of Arts and Sciences effectively for two years prior to her departure. Thus, the explanations for the Defendant's decision make manifest that the faculty members resented the fact that the confident, strong-willed leadership style was being exhibited by a woman. Not only is it contradicted by the search committee's written and testimonial admissions about Plaintiff's successes, it also reveals wide spread, insidious gender stereotyping. This issue is fatal to Defendant's motion.

Making employment decisions based on gender stereotypes violates Title VII. *Price-Waterhouse v. Hopkins*, 490 U.S. 228 (1989). "[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250. "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." *Oiler v. Winn-Dixie Louisiana, Inc.*, 2002 WL 31098541 at *5 (E.D. La. Sept. 16, 2002) (citing *Price Waterhouse*, 490 U.S. at 250-51).

In *Price-Waterhouse v. Hopkins*, the Supreme Court held that statements by members of the partnership committee suggesting that a successful, but aggressive, hard-working female go to charm school, wear more makeup, and dress in more feminine clothing demonstrated to the Court that her gender was illegally considered by at least some members of the partnership committee. 490 U.S. at 335. The significance of the statements was that the members of the committee who voted against her did so for gender based, not performance based reasons. Thus, the Court concluded that the partnership committee employed traditional gender stereotypical

ideas about how women are supposed to behave and act towards others and that since the

plaintiff did not conform to those standards, she did not receive an offer of partnership.

> The problem addressed by the Supreme Court in *Price Waterhouse* was that the

> [plaintiff's] so-called masculine qualities--what others perceived as her
> abrasiveness--would have been valued qualities in a man being considered for
> partnership. Price Waterhouse discriminated against [the plaintiff] because
> although she performed the 'masculine' role of competing successfully for
> business, the firm punished her for not simultaneously performing the 'feminine'
> role of speaking softly and having a feminine appearance. The Supreme Court
> held that Hopkins' failure to fulfill this gendered role was an impermissible
> consideration in the partnership decision . . . . Unlike 'masculine' men at Price
> Waterhouse, [the plaintiff] was punished because her 'masculinity' appeared
> inconsistent with gendered stereotypes of how women should look and behave . . .

*Weinstock v. Columbia University*, 224 F.3d 33, 57 (2d Cir. 2000)(Cardamone J., dissenting).

In *Costa v. Desert Palace, Inc.*, a female employee who suffered disparate treatment at

the hands of an employer who disliked her because she was "strong-willed" and "opinionated"

was found to be the victim of unlawful discrimination on the basis of gender stereotyping under

Title VII. *See.*, 299 F.3d 838, 861 (9th Cir. 2002), *aff'd* 539 U.S. 90 (2003). The court noted that:

"At trial, [the defendant's] consistent objection to [the plaintiff] as an employee was that she was

'strong-willed' and 'opinionated,' a view that the jury could have reasonably interpreted as

gender stereotyping."

The Second Circuit took up the issue of gender stereotyping under Title VII in *Weinstock*

*v. Columbia University*, 224 F.3d 33 (2d Cir. 2000). The *Weinstock* court held that *Weinstock*

was not the victim of gender stereotyping in violation of Title VII because she could not

introduce any evidence that the defendant engaged in conduct similar to that which the Supreme

Court described in *Price Waterhouse*. *Id.* at 44. Specifically, the Second Circuit held that the

plaintiff's uncorroborated allegations that she was called "nurturing" and "nice," even if true,

were not evidence of gender stereotyping that violated Title VII because the terms nurturing and

nice are not character traits that are limited to the stereotypical female personality. *Id.* The Court held that the plaintiff failed to put forth any evidence that she, like the plaintiff in *Price Waterhouse*, "was perceived negatively for lacking stereotypical feminine character traits [and] . . . did not fit the sexual stereotype of what a woman should be." *Id.*

Clearly, that is not the case presented here. The testimony and declarations of Defendant's representatives repeatedly referred to Plaintiff as inflexible, insensitive, overbearing, arrogant and unreasonably demanding are precisely the types of gender stereotyping remarks found to be problematic in *Price Waterhouse*. That Defendant would now attempt to use those stereotyping characterizations in its defense is utterly unacceptable. Indeed, it underscores a complete failure to recognize the prevalent problem of gender stereotyping.

The problems confronting women in the workforce today because of gender stereotyping are pervasive. "Gender socialization patterns . . . leave many women workers in a familiar double bind; they are criticized for being 'too feminine' or not 'feminine enough.' What is viewed as assertive in a man is abrasive in a woman." Deborah L. Rhode, *The No-Problem Problem: Feminist Challenges and Cultural Change*, 100 Yale L.J. 1731, 1753 (1991) (discussing the existing obstacles and the inequality confronting women in the workforce). There is pressure for women to fit a certain mold. "The ideal woman . . . is married, but has no children; attractive, without being too sexy; strong, but not too tough; ambitious, but not too aggressive. More buttoned up than Ally McBeal, less sweet than Mary Richards, fewer edges than Murphy Brown; a good athlete, and a good sport; active in professional groups, not women's groups; not a feminist . . . ." Note, Jamie Leeser, *The Causal Role of Sex in Sexual Harrassment*, 88 Cornell Law Review, 1750, 1789 n.256 (quoting Susan Estrich, Sex and Power 123 (2000)).

The consequences of gender stereotyping upon women in the workforce are not inconsequential. Professor Rhode has explained that:

> [d]espite a quarter-century's experience with equal opportunity legislation, women's experience remains far from equal. Female workers have moved into male-dominated professions but, as noted earlier, they are still dramatically underrepresented at the highest levels of occupational status and financial reward. For example, they hold about 13% of tenured academic posts, 6% of the partnerships of large law firms, 5% of federal elective offices, and 3% of executive positions at publicly traded corporations. . . . [E]qual pay mandates have not brought men and women significantly closer to obtaining equal pay. Full-time female workers earn about 65% of the annual salary of full-time male workers, the same as in 1955, and women of color again remain at the bottom of the economic hierarchy. Gender-based pay disparities persist within job categories even among workers with comparable credentials.[6] As was true a century earlier, the central problem is that too many individuals deny that any serious problem exists.[7] Although recent surveys find increasing perceptions of gender bias, a large percentage of the public still doubts its significance. Between 40 and 50% of surveyed men do not believe that women experience discrimination for top positions in government, business, or the professions. Among lawyers, almost four-fifths of women but less than half of men believe that there is gender bias in the bar. . . . For positions carrying the greatest social status and economic rewards, **female candidates are always in the pipeline but rarely in the pool from which final selections are made**. Adherents to this view are always cheerful about its implications: gender roles are breaking down, women are moving up, and full equality is just around the corner. At the moment, however, for the positions at issue, women, especially women of color, are reportedly unqualified or unavailable.

*Id.* at 1764-65 (emphasis added). And so it went at Fairfield University.

Research examining gender stereotyping in the workforce has led to several important findings about women in positions of leadership. In one study, "female leaders were devalued relative to men when they behaved in an autocratic and directive manner and when they worked in male-dominated fields (e.g., in the military, as athletic coaches). By contrast, women who led in a participatory or democratic style were evaluated as positively as their male counterparts.

---

[6] Indeed, Plaintiff was paid substantially less than males who held her identical position when she was Associate Dean, and far less than both her male predecessor and successor in the Dean's position.

[7] Consistent with this observation, every other member of the search committee denied any gender animus when polled by Dr. Grossman after Dr. McEvoy challenged the committee's conduct.

Thus, the devaluation of female leaders was restricted to incidents in which women behaved in ways that were stereotypically masculine, behaviors that may have disrupted 'traditional patterns of gender deference.'" Diana Burgess & Eugene Borgida, *Who Women Are, Who Women Should Be: Descriptive and Prescriptive Gender Stereotyping in Sex Discrimination*, 5 Psychology, Public Policy and Law 665, 673-74 (1999) (emphasis added). *See also* Mary F. Radford, *Sex Stereotyping and the Promotion of Women to Positions of Power*, 41 Hastings L.J. 471, 500-503 (1990) (describing how women in the workforce who display "masculine" personality traits or use "masculine" power strategies are viewed as less competent and "overbearing").

Several members of the search committee spoke about Plaintiff in a way that underscores the degree to which her forthrightness, independence, and assertiveness motivated their decision to exclude her. Dr. Grossman, when describing Plaintiff's lack of interest in discussing with him an overview of the faculty members when she was appointed acting Dean, said the following: "I felt that not only does she not care what I think, she also doesn't mind that I know that she doesn't care what I think .... I thought even if she didn't think it would be useful to have the information, she shouldn't tell her boss that. She should just have the courtesy of listening." (Grossman Depo. at 104-105.) Mary Frances Malone, an associate vice president of the University, allegedly complained to Dr. Grossman that Plaintiff "doesn't know when it's time to back off if she's not getting her way." (Grossman Depo. at 109.) Dr. Grossman was simultaneously told by others that Plaintiff was difficult to work with, but they would nevertheless work because she has "great ideas." (Grossman Depo. at 113.)

Dr. Schwab stated that, as Acting Dean, Plaintiff, unlike her male predecessors, lacked "leadership and vision" in that she had "a problem of building consensus." (Schwab Depo. at 48-51.) Dr. Schwab criticized that Plaintiff's "willingness to listen and understand ...." (Schwab

Depo. at 51.)  She also stated that Plaintiff was "not sensitive" to the heavy workload placed on the Fulbright applicants and "unreasonably demanding of the faculty." (Schwab Declaration at page 2.) These criticisms are strikingly incongruous with Plaintiff's success with the Fulbright program and Dr. Schwab's professed desire to select someone that would take the University "to the next level."

It is thus apparent that Plaintiff, like Ms. Hopkins of *Price Waterhouse* before her, was clearly the victim of gender stereotyping.  Plaintiff's leadership style, if exhibited by a man, would have been exemplary.  If on the resume of a man, Defendant would have praised Plaintiff's accomplishments, which are undeniably the very product of her vision and leadership style.  Unfortunately for Plaintiff, she was too "masculine" for a traditional institution like Fairfield University, whose history reveals its discriminatory orientation.

In addition to the historical absence of females in key administrative posts, Fairfield University also persistently paid Plaintiff a salary thousands less than her predecessor and 45,000 dollars less than the man who succeeded her as Dean.  Likewise, as an Assistant and Associate Dean, Fairfield University paid Plaintiff a salary 10,000 dollars less than her every comparable male counterparts.  Also, when Defendant does appoint women to Deanships, it does so to the leadership of schools which teach subjects that are consistent with the traditional female gender roles such as the School of Nursing and the School of Education.  Indeed, Fairfield University's own student newspaper criticized the fact that the institution lacks female representation in leadership positions and has never had a female administrator rise to the level of Vice President. When confronted with these facts, Defendant indignantly denies any possible wrongdoing. There is no reflection, no investigation and no change.

Much like the plaintiff in *Price Waterhouse*, Plaintiff was the self evident victim of gender stereotyping. Defendant chose not to select her as a finalist for the Deanship, despite the fact that she had performed the responsibilities of Acting Dean for two years and was praised for her previous performance as Assistant and Associate Dean of the College, because Plaintiff's personality differed from that of the "traditional woman."

Title VII prohibits the practice of gender stereotyping that limits the opportunities of women to traditional roles such as nurses and teachers and stifles non-conformist females such as Plaintiff. Title VII was enacted to force employers to evaluate women on their credentials and qualifications. The Supreme Court sent a clear message in its *Price Waterhouse* decision. In addition to the objective criteria such as credentials and qualifications by which men are measured, employers cannot subject women to a conformist quotient that measures the degree to which a person conforms to the appropriate gender norm. Conformity to traditional gender-normed personality traits cannot be relevant criteria on any employer's list of credentials and qualifications – for either men or women.

Title VII was intended to punish employers like Fairfield University who evaluate men and women differently. It is painfully obvious in this case that, when considering applicants for a position of leadership, Defendant subjected female applicants like Plaintiff to a personality pageant while males were judged by the length of their publications page and the prestige of their previous employer.

Defendant ignored the protest of Dr. McEvoy and other faculty members. Defendant failed to answer the call of its own student newspaper when it criticized the lack of women in positions of leadership at the school. Defendant should not be allowed to disregard another call to comply with the law. Title VII dictates that this Court hold Defendant accountable for its

32

failure to comply with the principles of gender equality. The fact that Defendant is an institution of higher learning that appears incapable of self examination while charged with the duty of inspiring and motivating the next generation of young women in our society, makes the proper resolution of this case that much more imperative. Thus, Defendant's motion must be denied.

### E.    Plaintiff's CFEPA Claim is Not Time-Barred

Defendant argues that Plaintiff's CFEPA claim of gender discrimination is time barred because she did not file her CHRO complaint within 180 days of January 31, 2001, when she was told that she was not selected for the final round of interviews with Father Kelley. This argument ignores the facts of the case and should be rejected.

In *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the Supreme Court held that the statute of limitations on a discrimination claim begins to run when the defendant communicates the alleged discriminatory employment decision to the plaintiff. *Id.* at 258. In an often overlooked footnote, however, the Court stated that "[w]e recognize, of course, that the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." *Id.* at 262 n.16.

Thus, Defendant's reliance on *Cerbone v. Int'l Ladies Garment Workers Union*, 768 F.2d 45 (2d Cir. 1985) is misplaced. Defendant cites *Cerbone* for the proposition that "[c]ourts have rejected arguments that the filing period should be extended pending an employee's knowledge that the conduct was discriminatory." (Def's Mem. Supp. Summ. J. at 20.) In *Cerbone* the Second Circuit made clear that its holding was limited to the facts of that particular case. The Court said:

> Though ordinarily the applicable period starts to run on the employer's commission of the unlawful act and is not tolled 'pending the employee's realization that the conduct was discriminatory,' a court might in some cases permit tolling 'as a matter of fairness.'  . . . We have noted that such an

extraordinary circumstance might be presented 'if the employee could show that it would have been impossible for a reasonably prudent person to learn that [an employment decision] was discriminatory.' This case presents no such extraordinary circumstance. According to his deposition testimony, Cerbone was fully aware that he had a potential age discrimination claim against his employers as early as the summer of 1981.

*Id.* at 48-49 (internal quotations and citations omitted).

Unlike *Cerbone*, the Plaintiff in the instant action could not have known that Defendant's failure to select her as a finalist was discriminatory when she learned of it on January 31, 2001. To the contrary, she did not learn that all the finalists were male until March, she did not learn who the candidate ultimately selected was until April, and her suspicions about discrimination were not confirmed until her May 23, 2001 discussion with Dr. McEvoy, who revealed what the committee had actually done. (Kahn Depo. at 23-24, 28, 46.)

Other courts have confronted scenarios similar to that which arose in the instant action, i.e. an employee does not learn that an adverse employment action was discriminatory until well after it occurs. In that connection, the Eleventh Circuit held:

Under equitable modification, a limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights. It is not necessary for a plaintiff to know all the facts that support his claim in order to file a claim. A plaintiff who is aware that he is being replaced in a position he believes he is able to handle by a person outside the protected age group knows enough to support filing a claim.

*Sturniolo v. Sheaffer/Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994) (holding, on an ADEA claim, that the time period began when the plaintiff knew or should have known that he was being replaced by a younger man, not when he was terminated because the employer gave him a legitimate, nondiscriminatory reason for the termination on the date that it occurred).

The Second Circuit has also applied the "knew or should have known" standard in judging when a time period begins. *See Yobo v. New York State Facilities Development Corp.*,

13 Fed. Appx. 41, 43 (2d Cir. 2001) (holding that a plaintiff's claim was time barred because "there was adequate evidence in the record that plaintiff knew or should have known that the alleged discriminatory act occurred . . . more than 300 days prior to the filing of the administrative complaint"). *See also Sabree v. United Brotherhood of Carpenters & Joiners*, 921 F.2d 396, 402 (1st Cir. 1990) ("A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.").

In the instant action, Plaintiff could not confirm that her gender was a motivating factor in Defendant's decision to reject her application until she talked with Dr. McEvoy. Plaintiff did not meet with Dr. McEvoy until May 23, 2001, and it was at that time that she had a reasonable basis to believe Defendant's decision was motivated by her gender.

## V.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied as to Counts One and Two of Plaintiff's Complaint.

THE PLAINTIFF, Beverly Kahn

By _____
      Craig T. Dickinson (CT 18053)
MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capitol Ave. - Suite 201
Hartford, CT 06106
(860) 246-2466
(860) 246-1794
cdickinson@mppjustice.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail on this date to

the following counsel of record:

Carolyn R. Linsey
OWENS, SCHINE & NICOLA, P.C.
799 Silver Lane
P.O. Box 753
Trumbull, CT 06611

Craig T. Dickinson