UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------x
BEVERLY KAHN,                : Case No.
    Plaintiff              : 3-02-CV-1576 (JCH)
                             :
v.                           :
                             :
FAIRFIELD UNIVERSITY,        :
    Defendant              : May 6, 2004
------------------------------------------------x

## LOCAL 56(a)(2) STATEMENT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Beverly Kahn, through her undersigned counsel, hereby submits the following statement pursuant to Rule 56(a)(2) of the Local Rules of the District of Connecticut.

A. **Plaintiff's response to Defendant's Local Rule 56 Statement.**

1. Admitted.

2. Admitted.

3. Admitted. Plaintiff adds that at the time the Defendant announced its search for a Dean in October 2000, Plaintiff had already served one year as Acting Dean and had been reappointed to serve in that capacity for 2000-2001 academic year. (See Appointment Letters, Defendant's Exhibit 18).

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted.

1

10. Admitted. Plaintiff contends that the committee did not conduct the search in conformity with the governance documents. In particular, the University's Equal Employment Opportunity and Affirmative Action policies and procedures were largely disregarded. (Affirmative Action Policies, Plaintiff's Ex. 7.) For instance, the members of the search committee were never briefed about the University's Affirmative Action policy. (*See, e.g.*, McEvoy Depo. at 13-14; Deignan Depo. at 20-23.) Moreover, the Affirmative Action Compliance Report required by University policies and procedures was not completed in a timely or accurate fashion. (See Guidelines, Defendant's Ex. 2, p. 3, and Affirmative Action Compliance Report, Defendant's Ex. 17.)

11. Admitted.

12. Admitted. (See response to number 6.)

13. Admitted, generally. However, Plaintiff adds that the qualifications and duties of the Dean of the College of Arts and Sciences is more fully documented in the University's official position description. (See Position Descriptions, Plaintiff's Ex. 8.) Moreover, Plaintiff contends that demonstrably fulfilled the criteria for the position as Acting Dean.

14. Admit in part, deny in part. While the advertisement for the Dean's position encouraged women and minorities to apply, and the University's policies and procedures espouse conformity with equal protection and affirmative action, the Defendant's search did not comport with those objectives. In fact, the University's Equal Employment Opportunity and Affirmative Action policies and procedures were largely disregarded. (Affirmative Action Policies, Plaintiff's Ex. 7.) For instance, the members of the search committee were never briefed about the University's Affirmative Action policy. (*See, e.g.*, McEvoy Depo. at 13-14; Deignan Depo. at 20-23.) Moreover, the Affirmative Action Compliance

Report required by University policies and procedures was not completed in a timely or accurate fashion. (See Guidelines, Defendant's Ex. 2, p. 3, and Affirmative Action Compliance Report, Defendant's Ex. 17.)

15. None in Defendant's statement.

16. Admitted.

17. Admitted.

18. Admitted. Plaintiff contends that to the extent there was any disagreement as to whether to interview all of the internal candidates, it had nothing to do with her qualifications. Plaintiff possessed all of the qualifications specified for the Dean's position and had performed in a highly regarded fashion as Defendant's Assistant, Associate and then Acting Dean for over ten years. (See Job Description, Plaintiff's Ex. 8; Performance Evaluation, Plaintiff's Ex. 4; Fulbright Recommendation Letter, Plaintiff's Ex. 2; Kelley Note, Plaintiff's Ex. 5; McEvoy Letter to Kelley, Plaintiff's Ex. 3; Committee Note, Plaintiff Ex. 9.)

19. Admitted

20. Admitted.

21. Admitted.

22. Admitted.

23. Admitted. Plaintiff contends, however, that any undue emphasis on the Dean being an academic role model was in direct contravention of the requirements for the position. (See Position Descriptions, Plaintiff's Ex. 8). Moreover, Father Kelley gave a charge to the search committee in which he reminded them that "since it is a committee composed primarily of faculty members that it is a search for an academic administrator and that

3

they should bear that in mind, that while such things as publications and research and so forth are important, what is really looked for is administrative skills . . . ." (Kelley Depo. at 28-29.)

24. Admitted. Plaintiff adds, however, that Dr. Schwab admitted to Plaintiff's unprecedented success up money for the Art Department, something Dr. Grossman was unable to do as Chair of the Department or as Dean. (Schwab Depo. at 26-27.) Dr. Grossman also admitted that many faculty members worked with Plaintiff because she has "great ideas." (Grossman Depo. at 113.)

25. Denied. Father Kelley admitted that Plaintiff's vision and leadership transformed Defendant's flagging Fulbright program into a consistent success. (Kelley Depo. at 15; see also McEvoy Depo. at 18; McEvoy Letter to Kelley, Plaintiff's Ex. 3.) Dr. Grossman described Plaintiff's Associate Dean performance as "outstanding" in numerous performance areas, including: accepting responsibility and initiating action; planning and organizing work; setting meaningful goals and reaching them on time; oral and written communication; staff and peer interaction; adjusting to new requirements and work conditions; sound decision making in diverse and stressful situations; and, *inter alia*, involvement in University service. Plaintiff's outstanding performance in those areas flatly contradicts any suggestion that she lacked the vision, leadership and interpersonal skills necessary to be an effective Dean. Indeed, Dr. Deignan conceded that it was reasonable to expect that as Acting Dean, the "boss" of the biggest school on campus, would occasionally do things employees didn't like or didn't agree with. (Deignan Depo. at 61).

26. Denied. Dr. Grossman's own words contradict any suggestion that Plaintiff's academic acumen suffered in comparison to the all male finalists. In support of Plaintiff's Fulbright grant application, Dr. Grossman described Plaintiff as having "enormous knowledge concerning the academic components of internationalizing the campus." He also noted that, "She has also been a key person in a wide variety of activities, both academic and otherwise . . . ." Further, several committee members recognized it was not reasonable to expect Plaintiff's academic record to be quite the same as other candidates because, unlike the other cansdidates, she had committed the prior ten of her career to administrative posts. (Committee Notes, Plaintiff's Ex. 9.)

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31. Admitted. Plaintiff adds that at that time she was not advised that all of the prospective finalists were male, and that at that time she had no other reason to suspect that gender animus had played a role in the committee's decision. (Kahn Depo. at 23-24, 28, 44, 46, 59, 124-126.)

32. Admitted. Plaintiff adds, however, that during her discussions with Dr. Grossman he failed to respond to several of Plaintiff's questions about why she was not selected. (Kahn Depo. at 125-26.) His only response was "mumbl[ing] something about the Pew grant." (Kahn Depo. at 124.)

33. Admitted.

34. Admitted.

5

35. Admitted. Plaintiff adds that after Dr. McEvoy addressed the committee, Dr. Grossman told her that he had "consulted with the University's attorney, and Beverly Kahn can make out a *prima facie* case for discrimination." (McEvoy Depo. at 65-66.) Nevertheless, he allowed the committee's decision to stand. (Id.) Dr. Grossman also admitted that he "wouldn't like it" if his daughter received the same treatment as Plaintiff. (McEvoy Depo. at 64.) After it became evident that the committee did not intend to heed her warning, Dr. McEvoy resigned from the search committee in protest. (McEvoy Depo. at 76; Resignation letter, Defendant's Ex. 23.)  Thereafter, Dr. McEvoy notified Father Kelley of her resignation form the committee and the reasons therefore. (McEvoy letter to Kelley, Defendant's Ex. 24).

36. Admitted.

37. Admitted. Plaintiff adds that it is consistent with gender stereotyping that the committee would deny any impropriety. Adding insult to injury, however, Father Kelly took no action, whatsoever, even after Dr. McEvoy alerted him to the possibility that the committee had discriminated against Plaintiff. (Kelley Depo. at 37-38, 53-58; Kahn Depo. at 154; McEvoy Depo. at 88-89.) Father Kelley did not even speak to Dr. McEvoy about the issues she had raised. (Kelley Depo. at 38, 57; McEvoy Depo. at 88-89.) The Human Resources department also failed to talk to any of the committee members about Dr. McEvoy's concerns. (Deignan Depo. at 73; McEvoy Depo. at 88-89.) Defendant also failed to follow up on concerns raised by other faculty members in connection with Plaintiff's exclusion from the final round of candidates. (Fedorchek and Sourieau Letters, Plaintiff's Ex. 10.)

38. Admitted.

6

39. Admitted.

40. Admitted.

41. Denied. The Affirmative Action Compliance Report completed by Dr. Grossman was patently false. In the report he falsely noted that there were no qualified minority candidates. (Report, Defendant's Ex. 17.) Comparing Plaintiff's resume to the job description irrefutably shows she was qualified. (Job Description, Plaintiff's Ex. 8; Plaintiff's Application Package, Defendant's Ex. 9.) The fact that Plaintiff was appointed and reappointed to the Acting Dean position makes the fact that she was "qualified" self-evident. (Appointment Letters, Defendant's ex. 18.) Indeed, there were at least three qualified female candidates after the committee had screened the applicants. Based on their own criteria, unqualified candidates were not offered interviews and Dr. Zahn, Dr. Borst and Plaintiff were all offered interviews. (Miners Depo. at 63; Candidate interview list, Defendant's Ex. 5.)

42. Admitted. Plaintiff adds that Dr. Falkner was offered and Dr. Snyder accepted a Dean Salary of $130,000, which is $45,000 than Plaintiff was paid when she was first appointed to the position of Acting Dean. (Offer Letters, Defendant's Ex. 15; Appointment Letters, Defendant's Ex. 18.) Plaintiff was also paid substantially less than Dr. Grossman, who preceded Plaintiff as Dean. This consistent with past practice pursuant to which Plaintiff was paid substantially less than her male counterparts in the Associate Dean position. (Pay Grievance Correspondence, Plaintiff's Ex. 6.)

43. Admitted.

44. Admitted. Plaintiff adds, however, that no alternate position was offered to her.

45. Admitted.

46.  Admitted.

**B.  <u>Plaintiff's Local Rule 56 Statement of Disputed Facts</u>.**

1.  There is an historic lack of representation of females in positions of leadership at Fairfield University, particularly the College of Arts and Sciences. The University's student newspaper, *The Mirror*, published an article documenting the lack of female representation at the highest levels of the University's administration. (Kelley Depo. at 68; Mirror Art., Plaintiff's Ex. 1)

2.  Faculty members have opined that the lack of representation is the result of a policy of not promoting women and a long tradition of favoring men. (*See, e.g.*, Kahn Depo. at 128, 141; Schwab Depo. at 12, 14-17.) Other female faculty members have observed unfavorable treatment towards women at the University. (*See* McEvoy Depo. at 75.)

3.  To the extent that Defendant does appoint females to leadership positions, such as Dean of a College, it is to schools that are stereotypically and historically occupations that are viewed as "appropriate" for women, such as Nursing, Education, and Continuing Education. (Kahn Depo. at 129; Kelley Depo. at 71; Grossman Depo. at 144.)

4.  Plaintiff was the first female administrator in the College of Arts and Sciences. (Kahn Depo. at 128.) Defendant has never appointed a female as the Dean of the College of Arts and Sciences or as its Academic Vice President. (Kahn Depo. at 128; Grossman Depo. at 141, 143-44.)

5.  As Assistant Dean of the School of Arts and Sciences, Plaintiff had a variety of academic and administrative responsibilities, which she performed very well. Indeed, she was nominated for and received a Fulbright grant in order to participate in a international

8

academic administration program in Tokyo, Japan. (Recommendation Letter and Grant Award Letter, Plaintiff's Ex. 2.)

6. Plaintiff was assigned to lead the Defendant's Fulbright scholarship application process. Before Plaintiff's involvement in the Fulbright process, Defendant's record in that regard was admittedly "[n]ot particularly good." (Kelley Depo. at 15.) According to Father Kelley, President of the University, Plaintiff "did a very fine job of preparing students" and as a result of Plaintiff's efforts, the University "became successful on a consistent basis." (Kelley Depo. at 15.) Dr. McEvoy, who worked on the Fulbright committee with Plaintiff since 1996, concurred in Father Kelley's praise for Plaintiff. (McEvoy Depo. at 18-19.) According to McEvoy, Plaintiff "was a real catalyst for getting it underway." (McEvoy Depo. at 18; McEvoy Letter to Kelley, Plaintiff's Ex. 3.)

7. Based on her excellent performance, she was promoted to Associate Dean in 1994 upon the recommendation of Dr. Grossman, then Dean of the College of Arts and Sciences. (Kahn Aff. ¶ 6; Kelley Depo. at 16; Grossman Depo. at 22.) In connection with her Associate Dean position, Plaintiff received her only written performance evaluation. In that evaluation, Dr. Grossman described her as "outstanding". (Grossman Depo. at 39-40; Plaintiff's performance evaluation, Plaintiff's Ex. 4.)

8. Plaintiff was paid substantially less than male counterparts that were appointed from the faculty to the other Associate Dean's position on a rotating basis. Plaintiff's salary as an Associate Dean in the College of Arts and Sciences was always 10,000 dollars less than her male counterparts – even though she had held such positions for years and she was performing the same job. (Kahn Depo. at 157; Grossman Depo. at 33-35.) Plaintiff challenged the University with respect to the disparity in salaries between her and her

9

       peers. (Kahn Depo. at 158; Pay Grievance Correspondence, Plaintiff's Ex. 6) Her request for increased compensation was denied by the then Academic Vice President, Dr. Wall. (Kahn Depo. at 163.)

9.     Plaintiff was appointed the Acting Dean of the College in 1999. (Kahn Aff. ¶ 7; Appointment letter, Defendant's Ex. 18.)

10.    Plaintiff received a salary as Acting Dean of the College of Arts and Sciences substantially less than that paid to Dr. Grossman when he was Dean. (Kahn Depo. at 158, 175-76.) Indeed, Dr. Grossman believed that Plaintiff deserved a higher salary. (Grossman Depo. at 53, 59-62.) Although she never received a salary equivalent to her male predecessor, Plaintiff was reappointed to the Acting Dean position in 2000. (Kahn Aff. ¶ 7; Reappointment letter, Defendant's Ex. 18)

11.    As the Acting Dean of the School of Arts and Sciences, Plaintiff performed all the responsibilities that would be expected of the Dean of the College. (Kelley Depo. at 26; Grossman Depo. at 93-94.) As part of her responsibilities as Acting Dean, Plaintiff participated in meetings with the council of academic deans. Plaintiff's relationship with the other deans on the council was collegial and her input to Dr. Grossman was appropriate. (Deignan Depo. at 14-15.) Other members of the council of academic deans observed that Plaintiff was doing an effective job in her role as Acting Dean of the School of Arts and Sciences. (*See, e.g.*, Deignan Depo. at 16.) Plaintiff worked well with the Deans in the other schools at the University and made positive improvements in academic programs. (*See, e.g.*, Deignan Depo. at 17-18; Miners Depo. at 19-25.) For instance, Plaintiff and Dr. Margaret Deignan, Dean of the Graduate School of Education

and Allied Professions, worked together to restructure and improve the undergraduate teacher certification program. (Deignan Depo. at 17.)

12. As Acting Dean, Plaintiff also worked well with department chairs in the School of Arts and Sciences. For example, Dr. Schwab, former Chair of the Department of Visual and Performing Arts, explained how Plaintiff, when Acting Dean, freed up more money for her department than had been available under Dr. Grossman, who was formerly the Chair of the Department of Visual and Performing Arts and the Dean of the College of Arts and Sciences. (Schwab Depo. at 30-31.) Another professor, Dr. Lawrence Miners, who worked with Plaintiff on a "daily" basis in the Dean's office, testified that he had a good relationship with Plaintiff when he worked with her in the Dean's office. (Miners Depo. at 19-25.) He also observed no problems between Plaintiff and any faculty members. (Id.) In his observation, Dr. Miners believed that Plaintiff performed her duties as Acting Dean effectively. (Miners Depo. at 33, 60.)

13. The Dean' search committee disregarded University policies and procedures. In particular, the University's Equal Employment Opportunity and Affirmative Action policies and procedures were largely disregarded. (Affirmative Action Policies, Plaintiff's Ex. 7.) For instance, the members of the search committee were never briefed about the University's Affirmative Action policy. (*See, e.g.*, McEvoy Depo. at 13-14; Deignan Depo. at 20-23.) Moreover, the Affirmative Action Compliance Report required by University policies and procedures was not completed in a timely or accurate fashion. (See Guidelines, Defendant's Ex. 2, p. 3, and Affirmative Action Compliance Report, Defendant's Ex. 17.)

14. The Dean's search committee also disregarded the express directions on Father Kelley, President of the University. Upon commencement of their task, Father Kelley instructed the committee that "since it is a committee composed primarily of faculty members that it is a search for an academic administrator and that they should bear that in mind, that while such things as publications and research and so forth are important, what is really looked for is administrative skills . . . ." (Kelley Depo. at 28-29.)

15. Plaintiff was nominated for the position and submitted an application for the Dean's position along with many other applicants from across the country. (Grossman Declaration, Defendant's Ex. A at 2; Plaintiff's Application Package, Defendant's Ex. 9.) Plaintiff met all of the objective criteria for the position. (See Position Descriptions, Plaintiff's Ex. 8, and Classified Ad, Defendant's Ex. 4).

16. Because she met the qualifications for the job, Plaintiff was selected for an interview by the committee. (Interview List, Defendant's Ex. 5.)

17. Plaintiff was the last candidate interviewed on Saturday, January 27. (Miners Depo. at 63; Interview Schedule, Defendant's Ex. 7.) According to members of the committee, Plaintiff had a good interview. (*See, e.g.*, Deignan Depo. at 41; McEvoy Depo. at 38-39.) Dr. McEvoy described Plaintiff's performance in the following way when asked about the discussion that took place following Plaintiff's interview: "I think the consensus was that she had given a boffo interview. Beverly Kahn was Beverly Kahn. She was on top of her game, she was knowledgeable, she was as you would expect being the acting Dean. She was highly energetic and knew everything about everything. And, you know, it was impressive except for people who weren't going to be impressed."(McEvoy Depo.

at 40.) After her interview, several committee members were in support of Plaintiff's candidacy. (McEvoy Depo. at 47-48.)

18. After the committee decided not to include Plaintiff as a finalist for the position, Dr. McEvoy explained to the committee that failing to include her as a finalist would be a *prima facie* act of discrimination. (Kahn Depo. at 106; Deignan Depo. at 66-70; McEvoy notes, Defendant's Ex. 22.) McEvoy explained, through the use of an illustrative chart comparing the credentials and qualifications of Plaintiff to each of the four men who had been preliminarily selected as finalists on the previous Sunday, that Plaintiff's qualifications were equal, if not superior, to the qualifications of the other four men. (McEvoy Depo. at 57-61; Comparison Chart, Defendant's Ex. 21.) McEvoy explained that Plaintiff was a fully qualified candidate who had worked her way up the ladder of assistant, associate, and then acting Dean at the University without any criticism about her performance in any of those roles or any evidence that she was not doing her job properly. As a result, Dr. McEvoy advised that Plaintiff would be able to make out a *prima facie* case of discrimination under Title VII. (McEvoy Depo. at 65.)

19. When Dr. McEvoy finished speaking to the committee, Dr. Grossman told her that he had "consulted with the University's attorney, and Beverly Kahn can make out a *prima facie* case for discrimination." (McEvoy Depo. at 65-66.) Nevertheless, he allowed the committee's decision to stand. (Id.)

20. After it became evident that the committee did not intend to heed her warning, Dr. McEvoy resigned from the search committee in protest. (McEvoy Depo. at 76; Resignation letter, Defendant's Ex. 23.) Thereafter, Dr. McEvoy notified Father Kelley

13

of her resignation form the committee and the reasons therefore. (McEvoy letter to Kelley, Defendant's Ex. 24).

21. After Dr. McEvoy expressed her concern about possible discrimination, Defendant conducted no investigation nor did it contact the University's affirmative action officer or the legal counsel to ensure compliance with anti-discrimination laws. (Kahn Depo. at 106-107; McEvoy Depo. at 88-89.)

22. The only action taken was by Dr. Grossman who asked the committee members at the time, in an informal manner, whether their decisions were motivated by Plaintiff's gender. (Deignan Depo. at 68-69.) Naturally, they denied any such impropriety. (See Declaration of Dr. Grossman, Defendant's Ex. A at 3.)

23. Father Kelly also took no action after Dr. McEvoy alerted him to the possibility that the committee had discriminated against Plaintiff. (Kelley Depo. at 37-38, 53-58; Kahn Depo. at 154; McEvoy Depo. at 88-89.) Father Kelley did not even speak to Dr. McEvoy about the issues she had raised. (Kelley Depo. at 38, 57; McEvoy Depo. at 88-89.)

24. The Human Resources department also failed to talk to any of the committee members about Dr. McEvoy's concerns. (Deignan Depo. at 73; McEvoy Depo. at 88-89.)

25. Defendant also failed to follow up on concerns raised by other faculty members in connection with Plaintiff's exclusion from the final round of candidates. (Fedorchek and Sourieau Letters, Plaintiff's Ex. 10.)

26. After the search committee made its final recommendations, Dr. Grossman completed the University's Affirmative Action Report. (Affirmative Action Report, Defendant's Ex. 17) In that connection, he falsely indicated that there were no qualified minority candidates

for the position. (Id.) As a result, he did not respond to any of the questions regarding the rationale for not hiring the qualified minority candidate, Plaintiff. (Id.)

27. The University's new Dean of the College of Arts and Sciences, Dr. Timothy Snyder, was paid 130,000 dollars per year, approximately 45,000 dollars more than Defendant paid Plaintiff during the preceding two year period when she served as Acting Dean. (Kelley Depo. at 50-51, 61; compare Kahn Acting Dean Appointment Letter and Snyder Offer Letter, Defendant's Exs. 16 and 18.) Father Kelley admitted that he gave no thought to the substantial pay inequity between Plaintiff and Dr. Snyder, and could not articulate any functional difference between Plaintiff's two year "temporary" appointment as Acting Dean and Dr. Snyder's "permanent" appointment as Dean. (Kelley Depo. at 50-51.)

28. Plaintiff learned the identity and gender of the four finalists in March 2001. (Kahn Depo. at 46.) Plaintiff did not learn until mid-April, however, that Defendant had made a final decision and chosen to hire a male applicant for the position. (Kahn Depo. at 23-24.) Plaintiff's suspicion that discrimination played a role in the selection process was confirmed May 23, 2001, when she met with Dr. McEvoy who explained that she believed Defendant's selection process and decision to hire a male instead of Plaintiff violated anti-discrimination laws. (Kahn Depo. at 28, 46, 59)

29. In response to Plaintiff's charge of discrimination, Father Kelley testified that he had heard "that [Plaintiff] was difficult to work with," which contradicted to Dr. Grossman's evaluation and Dr. Deignan's and Dr. Miners' testimony, (Kelley Depo. at 26.)

30. In response to Plaintiff's charge of discrimination, Dr. Schwab contradicted her own testimony about Plaintiff's unprecedented effort to free up money for the Art Department

and said that she found it very frustrating to work with Plaintiff. (Schwab Depo. at 26-27.) Dr. Schwab also provided inconsistent testimony when she indicated that the University needed a Dean "to take us to the next level," but complained that Plaintiff "made prospective Fulbright Scholars work hard on their applications, and . . . put pressure on them" and that Plaintiff was "unreasonably demanding of faculty." (Kahn Depo. at 101; McEvoy Depo. at 49; Schwab Declaration, Defendant's Ex. D at 2.)

31. Schwab also contended that Plaintiff failed to demonstrate "leadership and vision" because she had a "problem of building consensus," which contradicts Father Kelley's admissions about the Fulbright program, Dr. Deignan's experience restructuring the undergraduate teaching certification program, and Dr. Miners experience working with Plaintiff on a daily basis in the Dean's office, (Schwab Depo. at 45, 48, 50-51.)

32. When asked why she felt Plaintiff was less desirable than the male candidates, Dr. Deignan could only recall that Plaintiff's vision for the School of Arts and Sciences perhaps lacked "flexibility." (Deignan Depo. at 55.)

33. Dr. Deignan also stated that the committee members who opposed Plaintiff did so because she was "arrogant." (Deignan Depo. at 55, 58.) When asked to elaborate on Plaintiff's alleged arrogance, Dr. Deignan stated that "she would follow through on her own agenda regardless of whether or not she had departmental or faculty support." (Deignan Depo. at 55.) Deignan recalled that other committee members described Plaintiff as somebody who would "forge ahead and do what it was that she wanted to do regardless of how the faculty and the department felt about it." (Deignan Depo. at 60.)

34. Dr. Deignan admitted, however, that based on her previous interactions with Plaintiff, that Plaintiff was an effective leader who had always exhibited a collegial working

relationship with co-workers. (Deignan Depo. at 58-60.) Furthermore, to the degree that Plaintiff did in fact have any conflicts with the faculty, Dr. Deignan conceded that it was reasonable to expect that the "boss" of the biggest school on campus would occasionally do things employees didn't like or didn't agree with. (Deignan Depo. at 61).

35. In direct contradiction to his written assessment of Plaintiff's performance, Dr. Grossman testified that some "staff people felt that she was overbearing, that she kept them late, . . . associate deans occasionally complained that she would take projects over or give excessive advice unnecessarily or in some way interfere in their work." (Grossman Depo. at 40.) Dr. Grossman also recalled a couple of faculty members who complained to him that Plaintiff was condescending or bullying. (Grossman Depo. at 77-79.)

36. Dr. Grossman, explained that the male candidate selected, Dr. Snyder, was superior to Plaintiff with respect to his previous accomplishments and the vision of leadership he articulated during his interview. (Grossman Depo. at 158-159.) Dr. Grossman admitted, however, that many faculty members worked with Plaintiff because she has "great ideas," thus calling into question Plaintiff's supposed lack of vision. (Grossman Depo. at 113.)

37. Dr. Grossman's prior written description of Plaintiff's work also contradict any suggestion that Plaintiff's academic acumen suffered in comparison to the all male finalists. In support of Plaintiff's Fulbright grant application, Dr. Grossman described Plaintiff as having "enormous knowledge concerning the academic components of internationalizing the campus." He also noted that, "She has also been a key person in a wide variety of activities, both academic and otherwise . . . ."

THE PLAINTIFF, Beverly Kahn

By _____
Craig T. Dickinson  (CT 18053)
MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capitol Ave. - Suite 201
Hartford, CT  06106
(860) 246-2466
(860) 246-1794
cdickinson@mppjustice.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail on this date to the following counsel of record:

Carolyn R. Linsey
OWENS, SCHINE & NICOLA, P.C.
799 Silver Lane
P.O. Box 753
Trumbull, CT 06611

_____
Craig T. Dickinson