Kahn vs Fairfield University

1/9/2004

Father Aloysius Kelley

Page 28

1    Arts & Sciences position?

2         A    You say, did there come a time?

3         Q    Yes.

4         A    Yes.

5         Q    What involvement did you have in connection

6    with that process?

7         A    I gave the charge to the committee.  I

8    reviewed with the -- I reviewed with the Academic Vice

9    President to be responsible for the search.  The

10   makeup of the committee, actually, since it's all

11   pretty much spelled out in the faculty handbook, the

12   faculty appointments were handled in the way that they

13   were always handled.  I probably discussed with him

14   administrative appointments to that committee, but I

15   don't remember any details.

16        Q    When you indicated that you gave the charge

17   to the committee, what was involved with that

18   activity?

19        A    I meet with the Search Committee after it

20   has been constituted and remind them of -- mostly of

21   the fact that since it is a committee composed

22   primarily of faculty members that it is a search for

23   an academic administrator and that they should bear

24   that in mind, that while such things as publications

25   and research and so forth are important, what is

f8e6dcbc-f95c-490c-a417-15ea0ed5b383

Kahn vs Fairfield University

1/9/2004

Father Aloysius Kelley

Page 29

1  really looked for is administrative skills, so it's

2  not a very lengthy charge, but that's always the thing

3  that I have found most important to stress.

4      Q    Is it fair to say that you want to remind

5  them that the primary skill set is as an administrator

6  as opposed to a practicing academic?

7      A    As opposed to a full professor or the holder

8  of an endowed share, this is a very different

9  position.

10     Q    Did anyone on the committee ask you any

11  questions in connection with your charge at the time?

12     A    Not that I can recall.

13     Q    Do you know who the university's Affirmative

14  Action Officer was at the time that this Search

15  Committee was constituted?

16     A    I'm assuming it was Steve Jakab.

17     Q    It's my understanding that the university's

18  affirmative action policies called for the Affirmative

19  Action Officer to address Search Committees when they

20  are constituted.  Is that correct?

21     A    It sounds like it's correct.

22     Q    Okay.  Do you know whether or not Mr. Jakab

23  or anybody else from Human Resources ever addressed

24  the Search Committee for the Dean's position?

25     A    I don't know, and, you know, I wouldn't

f8e6dcbc-f95c-490c-a417-15ea0ed5b383

vs Fairfield University

1/9/2004                                    Father Aloysius Kelley

Page 36

1    particular, but I thought there should have been more.

2         Q    Did you have occasion to review any of the

3    progress of the work of the Search Committee for the

4    Dean's position?

5         A    I imagine when I had my regular meetings

6    with Dr. Grossman, he would have indicated in some

7    general way how the thing is going.  I don't remember

8    anything specific until the issue of Dr. McEvoy.  I

9    don't remember anything specific before that.

10        Q    Okay.  Now, you wouldn't have had any

11   occasion to review the advertisements that were run in

12   the paper or anything --

13        A    No, none of that.

14        Q    Okay.  How was it first brought to your

15   attention that Dr. McEvoy had raised a concern?

16        A    Dr. Grossman reported it to me.

17        Q    Do you recall when he reported that to you?

18        A    No.  He would have reported it to me soon

19   after it happened, but I can't tell you when.

20        Q    Did you have any knowledge as to when the

21   interviews of candidates were being conducted?

22        A    Only of the finalists, not of the

23   preliminary interviews.

24        Q    It wasn't the practice of the Search

25   Committee to inform you of when the initial round of

f8e6dcbc-f95c-490c-a417-15ea0ed5b383

1 interviews was scheduled?

2      A     No.

3      Q     Did you receive any information as to who

4 any of the candidates were that were going to go

5 through the initial round of interviews?

6      A     Not that I remember.

7      Q     Pardon me while I plow through.

8          What do you recall about what Dr. Grossman

9 told you in connection with Dr. McEvoy's concerns?

10     A     He told me that she felt that Dr. Kahn

11 should have been one of the finalists, and it seems to

12 me that he said that she felt that she really should

13 have been one of the finalists and was more qualified

14 maybe than people they were picking for a finalist.

15          What I don't remember is whether he told me

16 this before they had actually decided on the three.

17 What I do remember clearly is his telling me either in

18 that initial discussion or later that she said that

19 she felt strongly that Dr. Kahn should be one of the

20 finalists, but that it should then be indicated to me

21 that she was not to be hired. I remember that,

22 because I found it bizarre.

23     Q     Did you ever have occasion to talk to

24 Dr. McEvoy about her concerns?

25     A     I did not.

.n vs Fairfield University
1/9/2004                                                    Father Aloysius Kelley

Page 38

1       Q       Why not?

2       A       I got the letter, and I discussed it with

3   Dr. Grossman, who assured me that he had very, very

4   carefully questioned every member of the committee and

5   could find no grounds for this charge.

6       Q       I'm going to show you a document that was

7   marked as Exhibit 52 during the course of

8   Dr. Grossman's deposition.

9               Did you ever see that document before?

10      A       I don't recall ever seeing it.

11      Q       Okay.  Did you ever have occasion to discuss

12  with Dr. Grossman the substance of the qualifications

13  of the individuals that were scheduled for interviews

14  with you compared to Dr. Kahn's credentials?

15      A       What I get is a resume and a letter of

16  application, and then I meet with the Search

17  Committee.  And I followed this policy for 25 years.

18  I go around the table and ask for each of the

19  finalists that have been presented to me, ask each

20  member of the Search Committee to tell me what is the

21  single strongest point about that individual and the

22  single biggest reservation.

23              That's the nature of that meeting.  I've

24  always done it that way.  I find it's very helpful to

25  do that before I then interview the candidates in

f8e6dcbc-f95c-490c-a417-15ea0ed5b383

Page 49

1    what was an appropriate salary, taking a number of

2    things into consideration, including the salaries of

3    other deans and vice presidents to see where it fit

4    into the structure of administrative salaries at the

5    university.

6         Q    So the structure that it was intended to fit

7    into was an internal structure at Fairfield

8    University?

9         A    Uh-huh, yes.

10        Q    Was any consideration given to market rates

11   for the position, or is that built into the structure

12   already?

13        A    Well, no.  The market rates would sometimes

14   be a factor.

15        Q    Do you recall whether it was a factor in

16   connection with this offer?

17        A    I don't recall that it was.

18        Q    Did anyone -- or withdrawn.

19             Did you give any thought to the fact that

20   this was approximately $45,000 more than what Dr. Kahn

21   had been paid as the Acting Dean?

22        A    No, because they're two different things, an

23   acting salary and a permanent salary.

24        Q    Why is that?

25        A    Because the responsibilities are very

1/9/2004

Father Aloysius Kelley

Page 50

1    different.  You're asking someone to give up, in some

2    cases, a tenured faculty position and a very good

3    position at another institution to come to this

4    institution and assume full responsibility and

5    accountability for the running of the school.  We

6    don't ask that of an acting person.

7        Q    Well, the acting person is usually an

8    internal candidate, so they don't have to move;

9    correct?

10       A    That's right.  But it isn't just that.  It

11   isn't until you actually are given the job that you

12   really have the ultimate responsibility, so there's a

13   difference between acting and actually having the job.

14       Q    Can you articulate for me your perception of

15   what those differences are between a permanent

16   candidate and just the acting candidate in terms of

17   responsibilities?

18       A    It seems to me it's pretty clear, that you

19   do something temporarily or you do something

20   permanently, and that's different.

21       Q    Well, the question I have in connection with

22   this is that Dr. Kahn had served temporarily, but she

23   was in that position for nearly two years before the

24   follow-up candidate had been there.

25       A    Right.

Brandon Smith Reporting Service

1/9/2004    Kahn vs Fairfield University
Case 3:02-cv-01576-JCH    Document 46-3    Filed 06/08/2004    Page 8 of 26    Father Aloysius Kelley

Page 51

1       Q    So I can understand your rationale if you

2    were talking about a three-month or even a six-month

3    appointment, but it reaches a certain point where the

4    responsibilities aren't just associated with a

5    temporary posting.

6       A    But they are.  It still is a temporary

7    posting.  You get the salary that you have plus a

8    stipend to hold that responsibility for that time.

9       Q    And there was an adjustment that Dr. Kahn

10   received from the Associate Dean's position?

11      A    Right, which is the case with every acting

12   that I ruled on.

13      Q    What you've called a stipend?

14      A    Right.

15      Q    In some respects similar to what the

16   full-time faculty members receive when they serve as

17   an Associate Dean?

18                MS. LINSEY:  Objection as to form.

19                THE WITNESS:  Well, that's different.

20      Q    (By Mr. Dickinson)  But the intention is to

21   compensate them for the additional responsibilities

22   they take on outside of their normal position;

23   correct?

24      A    That's true.

25      Q    Now, there's a note on the first page of

Kahn vs Fairfield U

Orin Grossman, Ph.D.

Page 78

```
1    leadership position.  So it's less important whether

2    people feel comfortable with her as long as the project

3    moves forward.

4         Q.   Did Dr. Kahn get the projects moved forward?

5         A.   Yes, and I thought -- yes, yes, yes, yes,

6    which is why -- and I certainly thought that because

7    she had been successful at a reasonable number of

8    projects, even if there had been friction, even if

9    there had been faculty complaints about tone, about

10   style, about the way she worked with them, that she

11   still deserved the opportunity to see whether she could

12   grow into a leadership role, and I felt that was an

13   appropriate, it was both appropriate in terms of, first

14   of all I needed somebody who understood the job and

15   understood the basic workings of the school and,

16   secondly, that she deserves that opportunity.

17        Q.   Just to clarify on one of the issues that

18   people would come to you after a grant application had

19   been approved and complain about the process by which

20   it had been conceived and the grant application had

21   been written?

22        A.   Exactly.

23        Q.   And your response was, well, it was

24   successful, wasn't it?

25        A.   Human interaction that occurred.  In a
```

20a6c2c2-9c7c-4951-b32d-

Kahn vs Fairfield U

Orin Grossman, Ph.D.

1    disinclined --

2         Q.    Exercise it --

3         A.    -- disinclined to exercise it, that's
4    correct.

5         Q.    All right.  How did Dr. Kahn perform with
6    respect to her duties and responsibilities as the dean
7    of the College of Arts and Sciences, the acting dean?

8         A.    I would say uneven.  I would say some things
9    were okay, other things weren't.

10        Q.    What would you characterize as okay?

11        A.    Well, again, I think initiating projects; I
12   think she had some good ideas.  I think she had some
13   good ideas about what the school should be doing, grant
14   writing, curricular development.  I think grant writing
15   and curricular development were particular strengths.

16        Q.    Any other areas that you felt she was okay
17   in?

18        A.    Well, those are the main, just curricular
19   development and curricular oversight, you know.

20        Q.    You indicated there were some areas that you
21   felt she was not so good at --

22        A.    Yes.

23        Q.    -- what areas were they?

24        A.    Working with people, which in my judgment
25   becomes the core of the job more, much more at the

7/1/2003

Kahn vs Fairfield U

Orin Grossman, Ph.D.

Page 102

1    heart of the job as dean rather than associate dean.

2        Q.    You've -- have you described as best you can

3    why you feel that is such an integral core of the

4    dean's position as opposed to the job of being

5    associate dean?

6        A.    Yes, because the dean has no real power.  The

7    dean has more suasion and authority.  The faculty are

8    not employees who report to the dean the way the deans

9    report to the academic vice president.

10          We live in a -- the academic world, as you

11    may have come in touch with us in your work, the

12    academic world is an odd one, certainly, and faculty

13    members do not see themselves as employees.  They do

14    not see themselves as reporting to the dean.

15          You will notice in these two documents, for

16    example, that the ones that the faculty wrote up talk

17    about supervising the educational activity of the

18    College of Arts and Sciences.  The one that human

19    resources worked up --

20        Q.    For clarity of the record, you were just

21    referring to Grossman Exhibit 21.

22        A.    Twenty-one.  In Grossman 22, it says, "To

23    supervise faculty and staff within the college."  There

24    is no way that faculty members had anything to do with

25    that document.

Brandon Smith Reporting Service

20a6c2c2-9c7c-4951-b32d-b68...

Kahn vs Fairfield U

7/1/2003                                              Orin Grossman, Ph.D.

Page 103

1        Q.    Exhibit 22?

2        A.    Exhibit 22.  They do not see themselves in a,

3    in that role.  On the other hand, they want direction,

4    they want leadership, they want a sense of vision, they

5    want a sense of the dean knows where we're going.  So

6    they want that but they don't want the dean telling

7    them what to do, they don't want the dean saying this

8    is what we have to do, this is where we need to go.

9    They want that in very oblique terms.  So it becomes

10   much more of a real -- the old joke about herding cats

11   applies to faculty, you know, it becomes a very

12   difficult balancing act that requires skills, people

13   skills, because you do not have the ultimate authority

14   to say you are going to do this or else you're out of

15   here.

16       Q.    You don't have a hierarchy.

17       A.    Do not have a hierarchical relationship to

18   the faculty, even though on paper you are the dean of

19   the college.  But this is true of every educational

20   establishment I'm aware of.  And it is at least as true

21   at Fairfield as of the others.

22             And so it is that area, if you can't convince

23   people to work with you in a positive spirit, you have

24   a real problem, and that became, that seemed to become

25   a pattern.

20a6c2c2-9c7c-4951-b32d-b68c88f12220

Kahn vs Fairfield U

Orin Grossman, Ph.D.

Page 104

1           And I felt early on I wanted to sit with her

2    and tell her about the faculty and about the people and

3    about the personnel, about these issues that I had been

4    dealing with over seven years, and I -- the previous

5    dean had done it for me and I certainly found it very

6    helpful and I wanted to do it for Acting Dean Kahn and

7    she specifically refused.  She said, "I want to make up

8    my own mind."  And I --

9           Q.    Let me -- this was a discussion that you

10   wanted to have with --

11          A.    Early in, very early --

12          Q.    -- her --

13          A.    -- in her role as acting dean, I wanted to

14   sit down with her and go over the faculty, go over all

15   the people -- of course, she knew who they were, but

16   you don't see the faculty as associate dean the way you

17   see the faculty as dean.  All kinds of issues come up,

18   some serious and some petty and sometimes the petty

19   ones are the ones that kill you.  So in fact, I felt

20   she deserved to have a lot of stuff she didn't know

21   about in terms of individual faculty issues.

22          Q.    And someone had done that for you --

23          A.    Yes.

24          Q.    -- when you became the dean?

25          A.    Yes, yes.  He was leaving.  I was staying,

Kahn vs Fairfield U

7/1/2003                                                    Orin Grossman, Ph.D.

Page 105

1    certainly, but I still felt it was important to do

2    that.  She said no, she wanted to make up her own mind.

3    And I --

4         Q.    This is with respect to specific feedback

5    about faculty members?

6         A.    With respect to getting an overview, my

7    overview of the faculty members.  My overview.  And I

8    felt -- well, first of all, I felt that not only does

9    she not care what I think, she also doesn't mind that I

10   know that she doesn't care what I think.  And then,

11   secondly, I felt when you're working on difficult

12   issues, and there are all kinds of difficult personnel

13   issues that you get into as dean, very sensitive ones,

14   knowing what your boss thinks about it is useful.  You

15   may not agree with the boss, that's useful, though.

16   It's useful to know, because then you can feel how am I

17   going to change his mind or you might feel, boy, he was

18   really right about this one, this guy is even nuttier

19   than I thought, or whatever.  Whatever the reaction

20   might be, it would be useful to have the information.

21   But I also thought even if she didn't think it would be

22   useful to have the information, she shouldn't tell her

23   boss that.  She should just have the courtesy of

24   listening.

25              At any rate, she decided she wanted to do it

20a6c2c2-9c7c-4951-b32d-b68c88f12220

23

KAHN - DIRECT - LINSEY

Fairfield.   The prescription co-pay at Pace is $15.

Q     Does Pace University offer any benefits that
Fairfield University did not offer?

A     (Pause)   The silence is because I'm trying
to think if I can remember anything.   You have the
Benefits Handbook, so you can compare them.   Not that
I know of.

Q     Dr. Kahn, can you tell me the first date
that you were informed that you were not selected as
a final candidate for the position of Dean of Arts
and Sciences at Fairfield?

A     It was during a regularly scheduled meeting
with Orin Grossman in his office around the noon hour
on January 31st.

Q     Of what year?

A     2001.   Right?   We are talking 2001.   Okay.

Q     January 31, 2001?

A     Yes.

Q     Dr. Kahn, what date did you first learn that
the university had selected and hired a new Dean of
Arts and Sciences?

A     Sometime in mid-April.   I can't tell you the
precise date.   There was an announcement that was
sent around announcing that "Timothy Snyder has been

24

KAHN - DIRECT - LINSEY

selected as dean."  That went out the end of March.

I was out of the country at that time.  I was in

Italy.  I returned from Italy on April 8th, so it

would have been sometime after, probably in mid-April

that I would have learned that Snyder was selected

dean.

    Q    Dr. Kahn, what was the first date that you

spoke with legal counsel regarding this matter?

    A    Well --

          MR. DICKINSON:  Just let me caution

          you, and we are both about to do it, because

          it sounds like you are going to say more.

          She very specifically asked for the date.

          That is all you should provide to her.

    A    I don't know.  I will defer to him, because

he has office records.

    Q    You don't remember?

    A    No.  It would have been sometime in the

summer of 2001.

    Q    Was it after you had been offered the

position at Pace?

    A    Yes.

    Q    And was the first legal counsel that you

spoke with regarding this matter someone at

KAHN - DIRECT - LINSEY

Q    Did you talk to the university's affirmative action officer?

A    No.  Eventually when I decided to take action I went to a lawyer because this is a legal matter.

Q    Does the university have a grievance procedure with respect to discrimination?

A    Yes.

Q    Did you file a grievance with the university?

A    No.  When I decided to take action, I had left the university so the internal grievance procedure was no longer germane.

Q    But at the time that Dr. McAvoy communicated to you about her speech and her assessment of the situation, did you consider filing a grievance with the university?

A    On May 23rd?  No.

Q    Did you speak to any of the other committee members regarding matters that Dr. McAvoy had related to you?

A    Two committee members approached me and asked to speak to me during the spring.

Q    That was before then your conversation with

KAHN - DIRECT - LINSEY

Dr. McAvoy?

A    Yes, before my conversation with Dr. McAvoy.

Q    And did you speak with those committee
members?

A    Briefly.

Q    Who was that?

A    Dr. Miners and Dr. Deignan.

Q    Did you have a conversation in the spring of
2001 with Dr. Miners?

A    Yes.  I just said that.

Q    What was the sum and substance of that
conversation?

A    He told me that he was terribly sorry that I
had not been selected as a finalist.  I'm trying to
remember.  We had a brief conversation.  This was
just after I had learned that I was no longer a
finalist, so it probably was in March or February,
probably February.

        I did not probe him for information as to
what went on in the committee.  That isn't
appropriate.  And I told him that I was terribly
upset, and he shared my concern.

Q    Why wouldn't it be appropriate to ask a
committee member about what went on during the

168

KAHN - DIRECT - LINSEY

1

2      Q    What other females do you claim received

3  discriminatory treatment with respect to

4  compensation?

5      A    I'm not pursuing a case on behalf of other

6  females at the university, nor do I know what

7  everyone's salary was.  I know what mine was.

8      Q    I only asked because you said pattern, so

9  let me phrase it another way.

10     A    The pattern of my getting less than the men

11  in my office is what I mean, that pattern for 11

12  years.

13     Q    Did Dr. Wall indicate that your compensation

14  situation should more appropriately be compared to

15  other administrators who were not tenured faculty?

16     A    I believe that he might have said that or

17  written that.  We do have his correspondence.

18     Q    Dr. Kahn, you are not claiming that there is

19  any continuous ongoing practice between these salary

20  issues that arose in the 1990s and your consideration

21  by the selection committee, are you?

22     A    No.  For the record, let me point out I was

23  a tenured member of the faculty at Ohio State

24  University for 14 years and before that at the

25  University of South Carolina.  When I took the

169

KAHN - DIRECT - LINSEY

1    position at Fairfield, they made it clear that when

2    you came in as an administrator you did not come in

3    with tenure, but clearly the ad was for someone who

4    was a faculty member with the credentials and to be

5    tenurable, so it was a quirk in their system.

6    Traditionally deans are not hired with tenure or

7    faculty status, although it was given to Dr. Snyder

8    when he came in.

9        Q    Tenure or faculty status?

10       A    Both.

11                MS. LINSEY:  Mark this, please.

12                (Defendant(s) Exhibit 13 for ID:

13            Memo.)

14       Q    Showing you what we have marked as

15   Exhibit 13, Dr. Kahn, have you seen that document

16   before?

17       A    This was typed by Orin Grossman and given to

18   me.

19       Q    So, the author of this document is Orin?

20       A    Yes.

21       Q    In the ten or so years that you worked under

22   Orin's supervision --

23       A    It was less than that.  Orin was not the

24   dean that hired me.  Orin came to the office

180

KAHN - DIRECT - LINSEY

1

2    A    Yes.

3    Q    And that was one of your concerns in

4    Exhibit 15, whether you would be promoted from

5    assistant to associate, correct?

6    A    Yes.

7    Q    And there is a clear progression from

8    assistant dean to associate dean, correct?

9    A    Yes.

10    Q    Did you expect, Dr. Kahn, that there would

11    be the same line of progression from associate dean

12    to dean?

13    A    I didn't know that a deanship would become

14    available at Fairfield, but when it became available

15    and I had been there long enough with a record then I

16    applied for it and expected I would be given a fair

17    chance to get that job.

18    Q    But did you expect that you would have some

19    preference with respect to the consideration because

20    you were an associate dean?

21    A    No.   That isn't a factor.

22    Q    You understand in these situations the

23    importance of having a national search to find the

24    very best candidate for the position?

25    A    I would say there were two other --  It was

Page 48

1    the college.

2         When she became acting dean, she had an

3    opportunity -- this is where I disagree with your word

4    "empower" -- she had opportunity to demonstrate a

5    leadership and a vision.  But this did not materialize.

6    Q    Okay.  What opportunities for leadership and

7    vision did you perceive that she had?

8    A    There seemed to be a sense, my perception, that

9    the college didn't experience a change, a coming together,

10   debate, discussion, about what we could become.

11   Q    Had that type of discussion taken place prior to

12   the point in time that Dr. Kahn took the position of acting

13   dean?

14   A    I don't know.

15   Q    Well, you were the chair of a department for six

16   years prior to that point in time, correct?

17   A    Yes.

18   Q    And prior to the point in time that Dr. Kahn

19   became the acting dean, Dr. Grossman had been the dean of

20   the school of arts and sciences, correct?

21   A    Yes.

22   Q    By way of contrast to Dr. Kahn, in what way had

23   Dr. Grossman manifested the leadership and vision that was

24   an integral part of the dean's position?

25   A    He had and has an astute sensibility.  In my

Kahn vs Fairfield University

12/29/2003

Katherine Schwab

Page 49

1    department we experienced it when he was department chair.

2    When he became acting dean and then dean, he demonstrated

3    this on a larger scale.

4        Q    How did he demonstrate it?

5        A    He listens carefully.  He does not assume he

6    knows, he goes out and finds out.  He learns and develops,

7    I would say, a fluency in speaking with faculty from every

8    department.  This is coupled with a vision, which he made

9    clear when he became dean and when he became acting

10   vice-president, about intellectual endeavors, the real

11   business of the university, and his support of it.  He had

12   a way, and does, of galvanizing faculty, departments,

13   programs.

14          Those are remarkable qualities; and to me those

15   describe, to some degree, leadership and vision.  There are

16   many forms of leadership and vision, I will be the first to

17   recognize that.

18       Q    You indicated that Dr. Grossman had articulated

19   his vision; how did he do that?  Did he do that through a

20   formal address to the faculty, through a documentation?

21   How did he do that?

22       A    He did this in a formal address to the faculty,

23   both in the first meeting of the College of Arts and

24   Sciences every fall, but also to the general faculty in the

25   fall.

1a306f87-c92b-4dc6-a04e-32dbcac5ee19

Kahn vs Fairfield University

12/29/2003

Katherine Schwab

Page 50

```
 1        Q     Did he do that when he was the acting dean?

 2        A     I don't remember.

 3        Q     But that was part of a regular annual address

 4     when he was the dean; is it correct that he continues to do

 5     that now in his capacity as acting vice-president?

 6        A     It's an impression I have.

 7        Q     And you did not form that impression during the

 8     course of your work or during the course of time Dr. Kahn

 9     was the acting dean?

10        A     Correct.

11        Q     And you used the term "galvanizing."  Is it fair

12     to say when you say that it was a way that Dr. Kahn --

13     withdrawn.

14              When you use the term "galvanizing," is it fair

15     to state that Dr. Grossman had a method of leading by

16     consensus, that he was able to get the faculty to come

17     together on certain initiatives or goals?  Or were you

18     referring to something else when you used the term

19     "galvanizing"?

20        A     I think he was very successful at building

21     consensus even on difficult issues.

22        Q     What, if anything, was your observation with

23     respect to Dr. Kahn on that issue?

24        A     I think there was a problem of building

25     consensus.
```

1a306f87-c92b-4dc6-a04e-32dbcac5ee19

Kahn vs Fairfield University

12/29/2003

Katherine Schwab

Page 51

1      Q      In your experience or observation, what was the

2   problem?

3      A      There was a sense on my part, but I'm not alone,

4   that her willingness to listen and understand differed from

5   other examples.

6      Q      The foremost of them being Dr. Grossman?

7      A      He's one.

8      Q      What other ones would you have in mind?

9      A      Well, before Dr. Grossman, there was Dr. Danahar.

10  He was the dean when I first came.

11     Q      In your experience, Dr. Grossman and Dr. Danahar

12  were better listeners than Dr. Kahn?

13     A      Yes.

14     Q      You indicated earlier that Dr. Kahn as both an

15  assistant dean and an associate dean had been charged with

16  the responsibility for more specific programs or

17  initiatives as opposed to the global responsibility for the

18  College of Arts and Sciences, correct?

19     A      Correct.

20     Q      Had she been effective, in your observation, in

21  connection with those initiatives and programs?

22     A      Yes, in terms of Fulbrights and some grants.

23     Q      Did you have any interaction with respect to her

24  work on the Fulbright program?

25     A      No interaction directly --

Brandon Smith Reporting Service

1a306f87-c92b-4dc6-a04e-32dbcac5ee19

Kahn vs Fairfield University

1/7/2004

Margaret Deignan, Ph.D.

Page 59

1    A.    Yes.

2    Q.    What did they say in that regard?

3    A.    That the qualities that she would, the

4  qualities that she had demonstrated, they had seen her

5  demonstrate during the previous two years, did not

6  indicate to them that they could, that she could be an

7  effective leader.

8    Q.    Do you recall, other than the arrogance

9  remark, do you recall any additional qualities or

10  examples that were discussed that suggested that she

11  would not be able to function as --

12    A.    Not particularly.

13    Q.    -- an effective --

14        Okay.  Did you object to that

15  characterization and explain what your experiences with

16  her were?

17    A.    I did not object.  I was surprised.

18    Q.    Why were you surprised?

19    A.    I got the impression that my experience was

20  quite different than some of the other people on the

21  committee, that it would be easier to work with

22  Dr. Kahn than to work for her.

23    Q.    Your experience was that she was collegial,

24  correct, when you dealt with her?

25    A.    Correct.