UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEVERLY KAHN,          : | |
|     Plaintiff,          : | |
| : | CIVIL ACTION NO. |
| v.          : | 3:02-cv-1576 (JCH) |
| : | |
| FAIRFIELD UNIVERSITY,          : | |
|     Defendant.          : | FEBRUARY 17, 2005 |

**RULING RE: DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [DKT. NO. 37]**

Plaintiff Beverly Kahn ("Kahn") brings this gender discrimination action pursuant to Title VII, see 42 U.S.C. §2000e et seq. and the Connecticut Fair Employment Practices Act ("CFEPA"), see Conn. Gen. Stat. §46a-60, against her former employer, Fairfield University ("the University").[1]  The University made a motion for summary judgment [Dkt. No. 37], claiming that there is no issue of fact concerning Kahn's claim of discrimination.

**I.     FACTS & PROCEDURAL HISTORY**[2]

In May 1999, Dr. Beverly Kahn was temporarily appointed Acting Dean of Fairfield University's College of Arts and Sciences following the promotion of Orin Grossman, the previous Dean, to Academic Vice President of the University.  Fairfield

---

[1] The plaintiff's age discrimination claims, pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §621, et. seq., and CFEPA, and her common law claim of intentional infliction of emotional distress have been withdrawn.  See Pl.'s Opp. to Def.'s Mot. for Summ J. [Dkt. No. 42] at 1.

[2] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiff where the plaintiff provides evidence to support her allegations.

University first hired Kahn in 1990 as Assistant Dean of the College of Arts and Sciences and Associate Professor of Politics. The University promoted her to Associate Dean in 1994.

In October 2000, the University initiated a search to fill the position of Dean of the College of Arts and Sciences. The University appointed a Search Committee pursuant to University policy. The Committee included five members of the faculty of the College of Arts and Sciences; one member of the faculty of the Dolan School of Business; the Dean of the School of Education and Allied Professions; the President of the Alumni Association; the President of the Student Association; and Academic Vice President Grossman, who served as a non-voting member. Grossman informed Kahn of the process and suggested that she apply for the position.

The Search Committee was charged with selecting three finalists, from which group the successful candidate would be selected. To that end, the Search Committee identified ten semi-finalists, seven men and three women, and invited then to interview for the position. The semi-finalists included three internal candidates, one of whom was Dr. Kahn. In late January 2001, the Committee interviewed nine of the ten semi-finalists after one of the candidates withdrew her application. The committee members agreed that three of the candidates, including one woman, had not interviewed well.

On January 28, 2001, the Committee members voted on the nine interviewees. Each member voted for his top three choices. The top candidate received nine votes. Kahn received three votes and placed fifth. On or about January 30, Grossman

informed Kahn that her application was no longer under consideration by the Search Committee. Kahn claims that Grossman provided her with no other information regarding the search process and that there existed at that time no reason to suspect that gender discrimination motivated the Search Committee decision. Pl.'s Local Rule 56(a)(2) Statement [Dkt. No. 43 §A] at ¶ 32. On January 31, Dr. Sharlene McEvoy, a member of the Search Committee, advocated reconsideration of Kahn's candidacy and argued in Kahn's support. Def.'s Local Rule 9(C)(1) Statement [Dkt. No. 39] at ¶¶ 33-34. Upon McEvoy's contention that Kahn "could have a *prima facie* claim of gender discrimination," id. at ¶ 35, the Search Committee's chairperson polled the committee members, all of whom "stated that the selection process had been fair, proper and non-discriminatory." Id. at ¶ 37. The Search Committee then selected four, rather than three, finalists, all four of whom scored higher than Kahn when the votes had been tallied on January 28. Id. at 38. McEvoy resigned from the committee that day. Id. at ¶ 39.

Kahn contends that McEvoy complained to Father Aloysius Kelley, the President of the University, that the Search Committee had discriminated against Kahn, but that neither Father Kelley nor the University's Human Resources Department took action in this regard. Pl.'s Local Rule 56(a)(2) Statement [Dkt. No. 43 §A] at ¶ 37. McEvoy's dissent from the Search Committee's recommendation was also communicated to the University's Affirmative Action Officer. Def.'s Local Rule 9(C)(1) Statement [Dkt. No. 39] at ¶40.

The University offered the position to a 53 year-old male candidate, Dr. Thomas Falkner, who declined.  It then offered the position to a 41 year-old male candidate, Dr. Timothy Snyder, who accepted on March 15, 2001. Def.'s Local Rule 9(C)(1) Statement [Dkt. No. 39] at ¶42.  Dr. Snyder was offered and accepted a salary of $130,000, $45,000 more than the salary paid to Kahn when she accepted the position of Acting Dean, which salary was also less than that of the Dean whose tenure preceded Kahn's tenure.  Pl.'s Local Rule 56(a)(2) Statement [Dkt. No. 43 §A] at ¶ 42.  Kahn also claims that during her tenure as Associate Dean, the University paid her "substantially less than her male counterparts in the Associate Dean position."  Id.

The parties, of course, dispute Kahn's qualifications.  Kahn argues that she, along with at least two other female candidates, was qualified for the position. Pl.'s Local Rule 56(a)(2) Statement [Dkt. No. 43 §A] at ¶43.  The University concedes that a number of committee members experienced positive interactions with the Kahn during her administrative tenure at the University.  Kahn cites depositions of Search Committee members to support her contention that her tenure as an administrator had been overwhelmingly successful.  Pl.'s Local Rule 56(a)(2) Statement [Dkt. No. 43 §A] at ¶¶ 24-26.   While serving as Associate Dean, from 1994 to 1999, Kahn received one written evaluation; that evaluation described her as "outstanding."  Pl.'s Local Rule 56 Statement of Disputed Facts [Dkt. No 43 § B], at ¶7.  The University alleges, however, that three faculty members on the committee, all women, "had negative experiences under Dr. Kahn."  Def.'s Rule 9(C)(1) Statement [Dkt. No. 39] at ¶24.

4

In addition, the University argues that the position required significant academic accomplishments and that Kahn's academic credentials were less impressive than those of other candidates. Def.'s Rule 9(C)(1) Statement [Dkt. No. 39] at ¶¶13, 23, 26, 41. Kahn disputes both of the rationales provided by the University for not selecting her. Pl.'s Local Rule 56(a)(2) Statement [Dkt. No. 43 §A] at ¶¶ 23, 26.

Furthermore, Kahnues that gender discrimination pervades hiring and promotion practices at the University. Pl.'s Local Rule 56 Statement [Dkt. No 43 §B] at ¶ 1-3. Kahn was the first female administrator at the College of Arts and Sciences and a woman has never served as either Dean or Academic Vice President of the College of Arts and Sciences. Id. at ¶ 4. Furthermore, Kahn claims that she was paid $10,000 less than male counterparts performing the same job when she served as Associate Dean. Id. at ¶ 8. Finally, Kahn cites deposition testimony of Search Committee members to support her contention that it did not follow University policies and procedures regarding equal employment opportunity and affirmative action. Id. at ¶ 13.

Kahn claims to have learned the identity and gender of the finalists in March 2001 and the identity and gender of the successful candidate in mid-April. She claims that her suspicion that gender bias was a factor in the University's hiring decision was only confirmed on May 23, 2001, when she met with McEvoy. Id. at ¶ 28. When questioned about their decision, Search Committee members expressed concerns regarding Kahn's ability to build consensus and work well with others and complained that she was arrogant overly demanding of students and faculty. Id. at ¶¶29-33. Kahn

claims that these alleged concerns contradict admissions made by Search Committee members regarding Kahn's successful tenure as an administrator at the University.

The University has moved for summary judgment [Dkt. No. 37] on the basis that there are no genuine issue of material facts and that Kahn has not met her burden of showing that the University discriminated against her based on her sex.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).  In assessing the record to determine if such issues exist, all ambiguities must be resolved, and all inferences drawn, in favor of the party against whom summary judgment is sought.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir.1994).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.  When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

### III. STATUTORY STANDARDS

#### A. Title VII Standards

"Since 1964, Title VII has made it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . ., because of such individual's race, color, religion, sex, or national origin.'" Desert Palace, Inc. v. Costa, 123 S. Ct. 2148, 2150 (2003)(citing 42 U.S.C. § 2000e-2(a)(1)). Notably, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-

2(m).

In cases brought under Title VII, courts follow the now-familiar, burden-shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-511 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-256 (1981).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment." Burdine, 450 U.S. at 253. The initial burden in a disparate treatment claim brought under Title VII is on the plaintiff to establish a prima facie case of discrimination. To do so, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Upon the articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination which arose with the establishment of the prima facie case drops out. See St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 510-11 (1993).

Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment decision. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. Id. As the Supreme Court explained in Reeves:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147 (citations omitted).

Gender stereotyping can serve as evidence of pretext. Kahn analogizes the Search Committee's evaluation of her application to the case of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). In that case, the Supreme Court held that an employer violated Title VII when it encouraged a woman to behave according to a gender stereotype and, motivated by such stereotyping, penalized her by denying her a promotion. Id. In Weinstock v. Columbia University, 224 F.3d 33, 43-45 (2d Cir. 2000), the Second Circuit refused to find that allegations that a tenure committee referred to a

female candidate as "nice" and "nurturing" supported a finding of gender bias. The circuit court first found that there was no admissible evidence to support that the words were used. Id. at 44. Second, it concluded that "nice" and "nurturing" do not reflect a gender stereotype. Id. More recently, the Second Circuit directly considered the question, "What constitutes a 'gender-based stereotype'?" Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 119-20 (2d Cir. 2004). The court of appeals concluded that "this question must be answered in the particular context in which it arises, and without undue formulation." Id. at 120.

Evidence that an employer's reason is false, combined with the evidence presented to establish a prima facie case, in some cases can be sufficient to sustain a plaintiff's burden, and a plaintiff need not have further evidence of discrimination. Id.; see also Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir. 2001). Ultimately, a finder of fact may consider the strength of the prima facie case, the probative value of the proof that the defendant's reason is pretextual, and any other evidence presented in the case when determining if the plaintiff has sustained her burden. Zimmerman, 251 F.3d at 381-82.

However, even courts mindful of the fact that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated" have nonetheless granted summary judgment at the pretext stage where the plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." See Meiri v. Dacon, 759 F.2d 989, 997 (2d

Cir. 1985); see also Dister, 859 F.2d 1108; Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998)(reversing jury verdict in ADEA case because "Norton's very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough to support the jury's conclusion that he was fired because of his age."). According to the Second Circuit Court of Appeals in Meiri, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." See 759 F.2d at 98.

## IV.   DISCUSSION

### A.   Kahn's Claims Under State Law

The University argues that Kahn's claims under the CFEPA are time-barred. The parties dispute the date from which the statute of limitations ought to run. Kahn argues that the statute begins to run from the date when she had reason to believe that the University acted on the basis of gender bias. The statute and case law are quite clear, however, that a claim must be filed within 180 days "after the alleged act of discrimination." Conn. Gen. Stat. §46a-82(e); see also State v. Commission on Human Rights and Opportunities, 211 Conn. 464, 471-73 (1989) (employee cannot recover for employer's acts that occurred more than 180 days prior to filing). While "the 180 day time requirement for filing a discrimination petition pursuant to § 46a-82 (e) is not jurisdictional, but rather, is subject to waiver and equitable tolling," Williams v. Commission on Human Rights and Opportunities, 257 Conn. 258, 264 (2001), neither

waiver nor equitable tolling applies in the instant case. The University has not waived the defense. Furthermore, Kahn has not alleged, let alone come forward with evidence of, any actions by the University that might result in tolling of the statute of limitations.

Thus, Kahn's claims pursuant to the CFEPA are time-barred. Her claim under Title VII, however, are subject to a longer statute of limitations. The parties do not dispute that the Title VII claim was made timely. Therefore, the court must consider whether there exists a material question of fact with respect to the merits of Kahn's Title VII claim.

### B. Kahn's Claims Under Title VII

"Findings of discrimination, discriminatory intent, and causation are findings of fact." Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir. 1994). In order for her claims to survive the University's motion for summary judgment, Kahn must show that there is an issue of material fact about whether the University discriminated against her on the basis of her sex. See St. Mary's Honor Center, 509 U.S. at 511; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc). "At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir. 2001). Reviewing the record as whole, as a jury would, see Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999), the court concludes that, Kahn has established a prima facie case; the University has supplied

legitimate, non-discriminatory reasons for its actions; and Kahn has produced sufficient evidence suggesting that these reasons are pretextual to create a question of material fact.

### 1. Kahn Establishes a Prima Facie Case of Sex Discrimination

Kahn has succeeded in establishing a prima facie case of sex discrimination. "The burden of establishing a prima facie case of disparate treatment is not onerous." Burdine, 450 U.S. at 253. First, as a woman, Kahn is a member of a protected class. Second, Kahn's service as Acting Dean as well as the fact that the University only interviewed candidates it considered "qualified" establish that she was qualified for the position. Third, she suffered an adverse employment action when the University did not offer her the position of Dean. Fourth, this refusal to promote Kahn occurred under circumstances giving rise to an inference of discrimination: four male candidates and no female candidates were named finalists; two male candidates were offered the position; and the individual eventually named to the position was male.

### 2. The University Provides Legitimate Non-Discriminatory Reasons for Its Actions

"Once a prima facie case has been established, the burden of production shifts to the employer who must defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment decision." Byrnie, 243 F.3d at 102. The University asserts two such "legitimate, non-discriminatory reason[s]." Id. First, the University asserts largely subjective bases for its decision, including faculty members' frustration with Kahn's personality and work

style. Such subjective bases are not disallowed. They must be sufficiently well-articulated, however, to allow Kahn to attempt to rebut them. The Second Circuit has concluded that

> "an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." Knight v. Nassau County Civil Serv. Comm'n, 649 F.2d 157, 161 (2d Cir.1981). This is because "[a]ny defendant can respond to a [discrimination charge] with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1040 (2d Cir.1979) (internal quotation marks omitted). Accordingly, an "employer's explanation of its reasons must be clear and specific" in order to "afford the employee a full and fair opportunity to demonstrate pretext." Meiri v. Dacon, 759 F.2d 989, 996-97 (2d Cir.1985). Where an employer's explanation, offered in clear and specific terms, "is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn." Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir.1980).

Byrnie, 243 F.3d at 104-05.

Second, the University claims and provides evidence that the Kahn's academic record made her a less qualified candidate than the male candidates who were offered the position.

### 3. Kahn Creates a Material Question of Fact Regarding Pretext

In order for her claims to survive the University's motion for summary judgment, Kahn must provide evidence, whether direct or indirect, that the University's legitimate, non-discriminatory reasons are simply pretext and that motivating factor served as an improper gender bias. Kahn disputes the University's claimed legitimate, non-discriminatory reason on three fronts.

                a.      Committee Members' Comments Regarding Kahn's Personality.  According to the University, Search Committee members doubted Kahn's ability to lead effectively as well as her ability to articulate a vision for the University.  Kahn does not dispute that the Search Committee's consideration of subjective factors was appropriate.  Nevertheless, "[a] subjective evaluation, besides being clear and specific, must also be honest."  Byrnie, 243 F.3d at 105.  Kahn provides evidence to challenge the University's purported analysis of relevant subjective factors.  While the University "is entitled to use subjective criteria in choosing whom to hire, [Kahn] is also entitled to challenge the credibility of the decision's rationale."  Id.

      While some Committee members were impressed with her interview, McEvoy Depo. [Dkt. No. 43, McEvoy] at 40, others did not feel that Kahn's interview was as strong as that of other candidates.  Deignan Depo. [Dkt. No. 43, Deignan] at 53.  The successful candidate impressed the committee "with his explanation or his exposition of the role of leadership in the dean's office", "his strong accomplishments at Georgetown", and, to a lesser extent, "his scholarly accomplishments."  Grossman Depo. [Dkt. No. 43, Grossman] at 158; see also Miners Depo. [Dkt. No. 43, Miners] at 73.

      Some Search Committee members also doubted Kahn's ability to craft a vision for the College of Arts and Sciences.  The University, while providing conclusory deposition testimony hailing other candidates' ability to articulate such vision, provides no evidence to support the Committee members' conclusion regarding visioning ability.

15

Kahn, however, points to her application to support her contention that she provided the Search Committee with evidence of her educational and academic vision for the University. In addition, she points to her four-page exposition of educational values in her application for the position [Dkt. No. 37-1, Ex. 9] to support her contention that the University's claim that she lacked vision is pretextual. She directs the court to consider, by contrast, Snyder and Falkner's paper applications, neither of which includes such a "vision statement." Pl.'s Opp. to Def.'s Mot. for Summ. J. [Dkt. No. 42] at 22.

The court is presented with admissible evidence regarding the Search Committee members' opinions about Kahn's personality and work style. Kahn points to a June 1998 evaluation of her work as Associate Dean by then-Dean of the College of Arts and Sciences, Orin Grossman. [Dkt. No. 43, Ex. 4]. That document appears to have been the only written evaluation of Kahn's work during her tenure as Associate, and later Acting, Dean. The evaluation does not go into great detail regarding Kahn's work, but Kahn scored an "Outstanding" on twelve of twelve components of the evaluation. Id. Notably, the one point where she received a slightly lower score, which nonetheless placed her in the "Outstanding" range, was "Maintains open communication and sensitivity to staff interaction." Id. at 2. At his deposition, Grossman explained the lower score in that category. Grossman Dep. [Dkt. No. 43, Grossman] at 39-40. Staff had complained to him about Kahn's overbearing work style and her habit of requiring staff entitled to overtime to work without compensation for extra hours. Id. Grossman also received complaints from individuals who had worked

on successful grant applications with Kahn. Despite the receipt of the grant in question, applicants complained that they "felt condescended to or lectured to or felt in some way, you know, told what to do or felt in some way belittled." Id. at 79. Grossman himself, in working with then-Acting Dean Kahn, felt that she lacked "the courtesy of listening." Id. at 105. At search committee meetings, committee members discussed Kahn as "arrogant" -- "that she would follow through on her own agenda regardless of whether or not she had departmental or faculty support." Id. at 55.

Such characteristics might be considered positive, leadership traits. On the other hand, they might be considered flaws that make a person a less effective administrator. In context, they may also be considered improper gender stereotypes. While Search Committee members made conclusory statements that Kahn was "arrogant" or "difficult to work with," they had difficulty providing a basis for such conclusions. For example, Committee member Katherine Schwab, Associate Professor of Art History, when asked to explain why she found working with Kahn "frustrating," could point only to Kahn's requests that Schwab gather information regarding her department in "only a few days, usually less than a week." Schwab Depo. [Dkt. No. 43, Schwab] at 27. Given the imprecise nature of the University's purported legitimate, non-discriminatory reasons, the evidence provided by Kahn to support a factual finding of pretext is sufficient to defeat a motion for summary judgment.

            b.     Kahn's Academic Record. The second legitimate, non-discriminatory reason offered by the University is Kahn's inability to provide the sort of

academic leadership and background required of the Dean of the College of Arts and Sciences.  This reason is supported by the position's job description: "the Dean is responsible for providing leadership in the planning, implementation, and evaluation of the College's academic program."  Job Description: Dean of the College of Arts and Sciences [Dkt. No. 43, Ex. 8] at 1.  The job requirements included a doctorate degree as well as "an established reputation as an academician."  Id. at 3.

While Kahn had been a tenured Associate Professor at Ohio State University prior to 1990, she never received tenure at Fairfield University and much of her career had been spent in university administration, rather than in teaching, research, and writing.  At the time of the search, she had published six articles and book chapters.  In contrast, the man first offered the position had served as a tenured professor at another institution for ten years, published four books and twenty articles and book chapters.  Dr. Thomas Falkner's Application [Dkt. No. 39-1, Ex. 10].  Timothy Snyder, who accepted the position, occupied a named chair at another school.  He had published a book, a book chapter, and eight articles in refereed scholarly journals.  Dr. Timothy Snyder's Application [Dkt. No. 39-1, Ex. 11].

Again, Kahn does not dispute that her academic record was relevant to her application.  She does, however, dispute the true level of importance placed on the candidates' academic records by the Search Committee.  Kahn argues that the retrospective emphasis on the candidates' academic records serves as pretext for its discriminatory animus based on gender.  To support this contention, she directs the

court to University President Aloysius Kelley's instruction to the Search Committee that it prioritize administrative skills, rather than the candidates' publication and research record, in selecting finalists. Kelley Depo. [Dkt. No. 43, Kelley] at 28-29.

Given that Kahn, who holds a doctoral degree, met the minimum academic requirements the University set forth in the job description; that the President of the University did not consider academic prowess to be a primary factor in consideration of the candidates' applications; and evidence that suggests illegal gender bias served as a motivating factor of the University's decision, the court finds that summary judgment is not appropriate. "The nondiscriminatory reasons proffered" by the defendant "are in no way dispositive." Back, 365 F.3d at 124. A jury is free to credit or discredit testimony by University administrators and members of the Search Committee. "Viewing the evidence in the light most favorable to [the plaintiff], a jury could find that the [legitimate non-discriminatory reasons] were minor, and unimportant to the defendant[] before the development of the purported discriminatory motive." Id.

### III.    CONCLUSION

For the foregoing reasons, the University's motion for summary judgment [Dkt. No. 37] is DENIED in part and GRANTED in part.

**SO ORDERED.**

Dated this 17th day of February, 2005, at Bridgeport, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge